ANNETTE L. HURST (SBN 148738)
ahurst@orrick.com
DANIEL D. JUSTICE (SBN 291907)
djustice@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
405 Howard Street
San Francisco, CA 94105-2669
Telephone:   +1 415 773 5700
Facsimile:   +1 415 773 5759

WILLIAM W. OXLEY (SBN 136793)
woxley@orrick.com
ALYSSA CARIDIS (SBN 260103)
acaridis@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
355 S. Grand Avenue
Los Angeles, CA 90071
Telephone:   +1 213 629 2020
Facsimile:   +1 213 612 2499

*Attorneys for GitHub, Inc. and Microsoft Corporation*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| J. DOE 1, et al.,<br><br>     Individual and<br>     Representative Plaintiffs,<br><br>    v.<br><br>GITHUB, INC., et al.,<br><br>     Defendants.<br><br>AND CONSOLIDATED ACTION | Case No. 4:22-cv-6823-JST<br><br>Consolidated with Case No. 4:22-cv-7074-JST<br><br>**DEFENDANTS GITHUB AND MICROSOFT'S NOTICE OF MOTIONS AND MOTIONS TO DISMISS PORTIONS OF THE FIRST AMENDED COMPLAINT IN CONSOLIDATED ACTIONS**<br><br>Date:        September 14, 2023<br>Time:        2:00 p.m.<br>Courtroom:  6, 2d Floor<br>Judge:     Hon. Jon S. Tigar<br><br>Amended Complaint Filed:    June 8, 2023 |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ ii

NOTICE OF MOTIONS AND MOTIONS .................................................................. 1

MEMORANDUM OF POINTS AND AUTHORITIES ............................................... 1

INTRODUCTION AND SUMMARY OF ISSUES .................................................... 1

FACTUAL AND PROCEDURAL BACKGROUND .................................................. 3

      A.    The Technology At Issue – According To The Amended Complaint. ...................... 3

           1. OpenAI Develops A Generative AI Tool Called Codex. ............................ 3

           2. GitHub Offers Copilot, A Code Completion Tool Based On Generative AI. 4

      B.    Prior Proceedings. ....................................................................................... 5

      C.    Plaintiffs' New Allegations ......................................................................... 6

ARGUMENT ............................................................................................................. 9

I.    THE AMENDED COMPLAINT DOES NOT ESTABLISH ARTICLE III STANDING TO PURSUE CLAIMS FOR DAMAGES. ............................................................... 9

    A.    Plaintiffs Cannot Manufacture Standing To Seek Damages. .......................... 9

    B.    All Requests For Or Assertions Of Entitlement To Monetary Relief Should Be Dismissed. ................................................................................................ 12

II.   PLAINTIFFS' DMCA CLAIMS FAIL BECAUSE PLAINTIFFS DO NOT ALLEGE REMOVAL OR ALTERATION OF CMI FROM IDENTICAL COPIES OF WORKS. ... 13

III.  PLAINTIFFS' TORT CLAIMS ARE PREEMPTED BY THE COPYRIGHT ACT. ......... 15

IV.  THE TORT CLAIMS ARE DEFECTIVE FOR OTHER REASONS AS WELL. .............. 18

    A.    Plaintiffs Fail To Identify Applicable State Law For Their Common Law Claims. ... 18

    B.    Plaintiffs Fail To State A Claim For Intentional Or Negligent Interference With Economic Relations. ................................................................................... 18

    C.    Plaintiffs' New Attempt At An Unjust Enrichment Claim Does Not Cure Its Defects. ...................................................................................................... 20

    D.    Plaintiffs Have Not Alleged The Deprivation Of Money Or Property Required To Make A UCL Claim. .................................................................................. 21

    E.    Plaintiffs' Negligence Claim Fails To Identify Any Legal Duty Sounding In Tort. ... 21

CONCLUSION ......................................................................................................... 23

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4

*Apple Comput., Inc. v. Microsoft Corp.*,
5
   35 F.3d 1435 (9th Cir. 1994)..................................................................................................... 2

6

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009).......................................................................................................... 20, 21

7

*In re Bang Energy Drink Mktg. Litig.*,
8
   No. 18-cv-05758, 2020 WL 4458916 (N.D. Cal. Feb. 6, 2020) ............................................ 20

9

*Buchholz v. Meyer Njus Tanick, PA*,
   946 F.3d 855 (6th Cir. 2020).................................................................................................. 10
10

*Clapper v. Amnesty Int'l. USA*,
11
   568 U.S. 398 (2013)................................................................................................................ 10

12

*Crafty Prods., Inc. v. Fuqing Sanxing Crafts Co.*,
13
   839 F. App'x 95 (9th Cir. 2020) ............................................................................................. 16

14

*Crown Imports, LLC v. Super. Ct.*,
   223 Cal. App. 4th 1395 (2014)............................................................................................... 18
15

*Dastar Corp. v. Twentieth Century Fox Film Corp.*,
16
   539 U.S. 23 (2003).................................................................................................................. 17

17

*Design Basics, LLC v. WK Olson Architects, Inc.*,
18
   No. 17 C 7432, 2019 WL 527535 (N.D. Ill. Feb. 11, 2019)................................................... 13

19

*ESG Cap. Partners, LP v. Stratos*,
20
   828 F.3d 1023 (9th Cir. 2016)................................................................................................ 20

21

*Faulkner Press, L.L.C. v. Class Notes, L.L.C.*,
   756 F. Supp. 2d 1352 (N.D. Fla. 2010).................................................................................. 13

22

*Foley v. Interactive Data Corp.*,
23
   47 Cal. 3d 654 (1988) ............................................................................................................ 22

24

*Frost-Tsuji Architects v. Highway Inn, Inc.*,
   No. CIV. 13-00496, 2015 WL 263556 (D. Haw. Jan. 21, 2015)........................................... 13
25

*Fry v. Ancestry.com Operations Inc.*,
26
   No. 22-CV-140 JD, 2023 WL 2631387 (N.D. Ind. Mar. 24, 2023) ....................................... 10

27

*GBTI, Inc. v. Ins. Co. of Pa.*,
28
   No. CV F 09-1173, 2009 WL 2365409 (E.D. Cal. July 29, 2009) ......................................... 12

*Google LLC v. Oracle Am., Inc.*,
  141 S. Ct. 1183 (2021) ......................................................................................... 2, 15

*Harper & Row Publishers, Inc. v. Nation Enters.*,
  723 F.2d 195 (2d Cir. 1983) ...................................................................................... 16

*Hawkins v. Comparet-Cassani*,
  251 F.3d 1230 (9th Cir. 2001) ................................................................................... 12

*Korea Supply Co. v. Lockheed Martin Corp.*,
  29 Cal. 4th 1134 (2003) .............................................................................................. 20

*Kelly v. Arriba Soft Corp.*,
  77 F. Supp. 2d 1116 (C.D. Cal. 1999) ....................................................................... 13

*Ixchel Pharma, LLC v. Biogen, Inc.*,
  9 Cal. 5th 1130 (2020) ........................................................................................ 18, 19

*Kodadek v. MTV Networks, Inc.*,
  152 F.3d 1209 (9th Cir. 1998) ................................................................................... 17

*Kwikset Corp. v. Super. Ct.*,
  51 Cal. 4th 310 (2011) ............................................................................................... 21

*Langan v. United Servs. Auto. Ass'n*,
  69 F. Supp. 3d 965 (N.D. Cal. 2014) ........................................................................ 21

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) ................................................................................................... 10

*Maloney v. T3Media, Inc.*,
  853 F.3d 1004 (9th Cir. 2017) ............................................................................. 15, 17

*Montz v. Pilgrim Films & Television, Inc.*,
  649 F.3d 975 (9th Cir. 2011) (en banc) ..................................................................... 16

*Newman-Green, Inc. v. Alfonzo-Larrain*,
  490 U.S. 826 (1989) ................................................................................................... 11

*O'Connor v. Uber Techs., Inc.*,
  58 F. Supp. 3d 989 (N.D. Cal. 2014) ........................................................................ 19

*Orchard Supply Hardware LLC v. Home Depot USA, Inc.*,
  967 F. Supp. 2d 1347 (N.D. Cal. 2013) ..................................................................... 23

*Rhynes v. Stryker Corp.*,
  No. 10-5619 SC, 2011 WL 2149095 (N.D. Cal. May 31, 2011) ............................... 12

*Rosen v. Uber Techs., Inc.*,
  164 F. Supp. 3d 1165 (N.D. Cal. 2016) ............................................................... 18, 19

*Sony Comput. Ent., Inc. v. Connectix Corp.*,
    203 F.3d 596 (9th Cir. 2000).................................................................................................... 2

*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2016) ............................................................................................................... 5

*Vermillion v. Corrections Corp. of Am.*,
    No. CV F 08-1069, 2008 WL 4058063 (E.D. Cal. Aug. 28, 2008) ....................................... 12

*West v. City & Cnty. of S.F.*,
    No. 21-cv-02370, 2022 WL 1556415 (N.D. Cal. May 17, 2022)......................................... 23

*Westside Ctr. Assocs. v. Safeway Stores 23, Inc.*,
    42 Cal. App. 4th 507 (1996)............................................................................................ 18, 19

*Wilbur v. Locke*,
    423 F.3d 1101 (9th Cir. 2005)............................................................................................. 11

**Statutes**

Copyright Act, 17 U.S.C. §§ 101, *et seq.*
    § 102 ..................................................................................................................................... 15
    § 103 ..................................................................................................................................... 15
    § 106 ............................................................................................................................... 15, 17
    § 301 ......................................................................................................................... 3, 6, 15, 16, 7
    § 301(a) ................................................................................................................................ 15
    § 1202(a) ................................................................................................................................ 6
    § 1202(b)(1) ...................................................................................................................... 6, 13
    § 1202(b) ......................................................................................................................... *passim*
    § 1202(b)(3) ...................................................................................................................... 6, 13
    § 1202(c) .............................................................................................................................. 14

Cal. Bus. & Prof. Code §§ 17200, *et seq* ................................................................................. 21

California Civil Code
    § 3294................................................................................................................................... 12
    § 3294(a) .............................................................................................................................. 12
    § 3294(c) .............................................................................................................................. 12

**Other Authorities**

Federal Rules of Civil Procedure
    Rule 8 .................................................................................................................................... 5
    Rule 9 .................................................................................................................................... 5
    Rule 10 .................................................................................................................................. 5
    Rule 12(b)(1)...................................................................................................................... 5, 9
    Rule 12(b)(6)............................................................................................................... 5, 6, 12

S. Rep. No. 105-190 (1998) .................................................................................................... 14

iv

## **NOTICE OF MOTIONS AND MOTIONS**

**TO PLAINTIFFS AND THEIR ATTORNEYS OF RECORD**:

**PLEASE TAKE NOTICE THAT** on September 14, 2023 at 2:00 p.m., before the Honorable Jon S. Tigar seated in Courtroom 6 of the United States Courthouse at Oakland, California, with appearances to be made by Zoom videoconference unless otherwise ordered by the Court, Defendants GitHub, Inc. ("GitHub") and Microsoft Corporation ("Microsoft") will, and hereby do, move, pursuant to Federal Rules of Civil Procedure, 12(b)(1) and 12(b)(6) to dismiss portions of the operative Amended Complaint in these consolidated actions, filed as ECF No. 98 in the 4:22-cv-6823 action (the "Amended Complaint" or "Am. Compl."), as to both GitHub and Microsoft.

The grounds for the Motions are as follows. First, insofar as Plaintiffs attempt to plead any claims for damages in the Amended Complaint, those claims should be dismissed pursuant to Rule 12(b)(1) because Plaintiffs fail to allege that they suffered any actual injury at the hands of either GitHub or Microsoft. Accordingly, all requests for or assertions of entitlement to monetary relief should be dismissed from the case, and Plaintiffs' requests for punitive damages should be independently dismissed pursuant to Rule 12(b)(6) because Plaintiffs fail to plead entitlement to such relief. Second, Counts 1, 4, 5, 6, 7, and 8 of the Amended Complaint should be dismissed pursuant to Rule 12(b)(6) because they are either (a) legally foreclosed, (b) deficient because factual allegations required to support necessary elements are missing or implausible, or (c) both.

1

GitHub And Microsoft's MTD Am. Compl.
No. 4:22-cv-6823-JST

1                           **MEMORANDUM OF POINTS AND AUTHORITIES**

2                           **INTRODUCTION AND SUMMARY OF ISSUES**

3       The central premise of Plaintiffs' case is that GitHub's Copilot AI tool, in response to user

4 input, is capable of generating coding suggestions that are reproductions of Plaintiffs' code.  But

5 Plaintiffs' initial Complaint had a critical defect.  As this Court found, Plaintiffs failed to allege

6 that Copilot had ever actually generated any suggestion reproducing *their* code, leaving Plaintiffs

7 uninjured and therefore without standing to pursue damages.  Lacking real-life instances of harm,

8 Plaintiffs now try to manufacture some.  In their Amended Complaint, Plaintiffs set about to

9 create "a few examples of Plaintiffs' code being reproduced," Am. Compl. ¶ 127, by themselves

10 mechanistically entering their own code into a code editor until Copilot generated a suggested

11 completion that looked like (but still differed from) Plaintiffs'.  Far from fixing the defect,

12 however, Plaintiffs' contrived examples simply confirm how implausible it is that Copilot has

13 ever actually generated a copy of Plaintiffs' code.

14       The problem with Plaintiffs' examples is that there is nothing in the Amended Complaint

15 to suggest that the prompts Plaintiffs employed would ever actually happen in the real world.  In

16 one example, Plaintiffs precisely transcribed 22 lines of a function that sets up a game board—

17 including the name of the game being set up, layout of the board, and number and type of

18 pieces—before Copilot suggested an 18-line completion that was not even an exact copy (more

19 on that in a moment).  It is inconceivable that an actual user would somehow precisely type in 22

20 lines of that code by chance or accident while working on her own coding project.  That is why

21 Plaintiffs do not even attempt to allege that any real-life user would or could come anywhere

22 close to entering prompts anything like those that yielded Plaintiffs' examples.  The fact that

23 Plaintiffs had to go to such unrealistic lengths to manufacture even the few examples they include

24 in the Amended Complaint only reaffirms how unlikely it is that Plaintiffs have actually suffered

25 any injury.  Plaintiffs' attempt to manufacture standing fails.  *Infra* § I.

26       Plaintiffs' examples also undermine their theory on the merits—and here it is not the

27 prompts, but the outputs that are the problem.  Plaintiffs continue to allege that Copilot cannot

28 really code "the way a human would," Am. Compl. ¶ 58, and instead is just "reproducing," Am.

1    Compl. ¶ 77.  But Plaintiffs were unable to manipulate Copilot into emitting a "verbatim copy of

2    copyrighted code."  Am. Compl. ¶ 78.  Their examples all contain variations from their code, just

3    as you might expect from an AI model that has learned common functional concepts across a

4    universe of code, then generated context-dependent suggestions that incorporate that learning.

5    Indeed, one example Plaintiffs tout is nothing more than a list of known chemical compounds in

6    the same order as a list widely available on the internet—and even that is not a verbatim

7    reproduction of Plaintiffs' version.  This is all of little surprise, since Plaintiffs elsewhere admit

8    that the way Copilot actually works is by discerning "statistically significant patterns."  Am.

9    Compl. ¶ 85.  Because Plaintiffs do not allege that any of *their* code is prevalent enough to be

10   detected as a pattern in the training set, it is implausible that Copilot would ever output that

11   code—even assuming, as necessary at this stage, that "about 1% of the time" Copilot may more

12   precisely reproduce a snippet of *someone else's* oft-repeated code, Am. Compl. ¶ 94.

13          That is why Plaintiffs are now forced to concede that, even in the tiny universe of

14   contrived Copilot outputs they created, "more often" those outputs *differ* from their code.  Am.

15   Compl. ¶ 96.  And to accommodate this reality, the Amended Complaint vastly expands their

16   legal theory to reach not just actual reproductions, but also "functionally equivalent" code

17   suggestions.  Am. Compl. ¶ 103.  But it is beyond dispute that copyright protection does not

18   extend to the functionality (as opposed to the expression) of the underlying code.  *See Sony*

19   *Comput. Ent., Inc. v. Connectix Corp.*, 203 F.3d 596, 599 (9th Cir. 2000); *Apple Comput., Inc. v.*

20   *Microsoft Corp.*, 35 F.3d 1435, 1444-45 (9th Cir. 1994); *cf. Google LLC v. Oracle Am., Inc.*, 141

21   S. Ct. 1183, 1197-1200 (2021).  So Plaintiffs' new reliance on variations with alleged functional

22   equivalency does not work for their claims under § 1202(b).  While GitHub and Microsoft do not

23   re-raise here the arguments this Court previously addressed with respect to Plaintiffs' § 1202(b)

24   claims, this Court did not expressly resolve whether Plaintiffs' failure to allege that CMI was

25   removed from identical copies meets the statutory requirement that the resulting infringement

26   concern "copies … of a work," a requirement Plaintiffs' new theory could never satisfy.  The

27   Amended Complaint's new reliance on algorithmic similarities underscores the need for this

28   Court to reach the "copies" limitation of § 1202(b).  *Infra* § II.

GITHUB AND MICROSOFT'S MTD AM. COMPL.
NO. 4:22-cv-6823-JST

Finally, Plaintiffs' Amended Complaint includes one more expansion worthy of note. Previously, the Court was skeptical whether the original Complaint was meant to premise liability merely on the training of machine learning models, rather than on outputs. Plaintiffs now advance two claims—unjust enrichment and negligence—that clearly attack training alone as purportedly unlawful: "Defendants have unjustly utilized access to Licensed Materials hosted on GitHub to create Codex and Copilot." Am. Compl. ¶ 269. These claims, as well as all of Plaintiffs' other tort claims are still defective. Each is based on either the alleged reproduction or distribution of code, or use of code to prepare a derivative work, and is therefore preempted by § 301 of the Copyright Act. *Infra* § III. And each has additional defects as well. *Infra* § IV.

## FACTUAL AND PROCEDURAL BACKGROUND

**A.    The Technology At Issue – According To The Amended Complaint.**

### 1.    OpenAI Develops A Generative AI Tool Called Codex.

OpenAI is a nonprofit organization that develops machine learning models, also referred to as "Artificial Intelligence." Am. Compl. ¶¶ 2, 167, 169. Such models are typically trained through exposure to a corpus of material called "training data." Am. Compl. ¶ 85. The patterns discerned from the set of training data become part of the model, which can then generate answers based upon those patterns in response to user prompts. Am. Compl. ¶ 85; *see* Am. Compl. ¶ 56.

The model at issue in this case is called Codex. Codex is a generative AI model trained on publicly available computer source code. Am. Compl. ¶¶ 56, 176. The model embodies "inferred … statistical patterns governing the structure of code," Am. Compl. ¶ 56, which it has discerned from the training data based on "a complex probabilistic process." Am. Compl. ¶ 83. It is thus capable, in response to a prompt, of "predic[ting] … the most likely [coding] solution." Am. Compl. ¶ 83. "[E]ssentially [it] returns the solution it has found in the most [coding] projects when those projects are somehow weighted to adjust for whatever variables [the model] ha[s] identified as relevant." Am. Compl. ¶ 83.

Generative AI models are capable of "simulat[ing] human reasoning or inference," engaging in the same sort of pattern recognition, synthesis, and prediction we do. Am. Compl.

1    ¶ 2.  AI models like Codex also enable statistical analysis and prediction vastly more powerful,

2    efficient, and sensitive than what the human brain can accomplish.  Am. Compl. ¶ 85.  At the

3    same time, Codex "does not understand the meaning of code," Am. Compl. ¶ 58, nor its

4    "semantics and context the way humans do," Am. Compl. ¶ 85.  Codex thus offers both the

5    ingenious and the mundane, a powerful tool of invention for humans who supply the insight to

6    direct its range of performance.

7         **2.      GitHub Offers Copilot, A Code Completion Tool Based On Generative AI.**

8         GitHub Copilot is a programming assistant.  Am. Compl. ¶ 8.  The Amended Complaint

9    alleges that Copilot "uses the OpenAI Codex to suggest code and entire functions in real-time" to

10   software developers.  Am. Compl. ¶ 51.  To use Copilot, a GitHub user installs it "as an extension

11   to various code editors, including Microsoft's Visual Studio and VS Code."  Am. Compl. ¶ 71.

12   "As the user types [code] into the editor," Copilot treats the user's input as a prompt, generating

13   suggestions for code that may be appropriate for the developer's purposes.  Am. Compl. ¶ 71.

14   Copilot is a subscription tool available to GitHub users for $10 per month or $100 per year.  Am.

15   Compl. ¶ 8.

16        Plaintiffs allege that the generative AI model that powers Copilot was trained on billions

17   of lines of code that GitHub users stored in public GitHub repositories.  *See* Am. Compl. ¶¶ 87,

18   186.  When GitHub users put their code on GitHub, they choose whether to make the code

19   repositories private or public.  Am. Compl. ¶ 160.  Users who set their repositories "to be viewed

20   publicly … grant each User of GitHub a nonexclusive, worldwide license to use, display, and

21   perform Your Content through the GitHub Service and to reproduce Your Content solely on

22   GitHub as permitted through GitHub's functionality."  Am. Compl. Ex. 1 at 27 (GitHub Terms of

23   Service ("TOS") at 7).  Every user agrees to GitHub's TOS, which include a "License Grant" to

24   GitHub to "store, archive, parse, and display … and make incidental copies" as well as "parse it

25   into a search index or otherwise analyze it" and "share" the content in public repositories with

26   other users.  Am. Compl. Ex. 1 at 26-27 (GitHub TOS at 6-7).  And users can also select from a

27   range of preset open source licenses to apply to the code published in their various GitHub

28   repositories, apply their own individual licenses, or select none at all.  Am. Compl. ¶ 38 n.4 &

4

1  Appx. A.

2      Any GitHub user thus appreciates that code placed in a public repository is genuinely

3  public.  Anyone is free to examine, learn from, and understand that code, as well as repurpose it

4  in various ways.  And, consistent with this open source ethic, neither GitHub's TOS nor any of

5  the common open source licenses prohibit either humans or computers from reading and learning

6  from publicly available code.  *See* Am. Compl. ¶ 38 n.4 & Appx. A.

7  **B.**     **Prior Proceedings.**

8      In the initial Complaint, Plaintiffs raised twelve claims against Defendants.  Compl., Doe

9  3 v. GitHub, Inc., No. 22-cv-7074-JST (N.D. Cal. Nov. 10, 2022), ECF No. 1.  GitHub and

10  Microsoft moved to dismiss the entirety of the initial operative complaint pursuant to Federal

11  Rules of Civil Procedure 8, 9, 10, 12(b)(1), and 12(b)(6).  Mots. to Dismiss Operative Compl. in

12  Consol. Actions, ECF No. 50.

13      This Court granted in part and denied in part GitHub and Microsoft's motions to dismiss.

14  ECF No. 95.  On standing, this Court held that Plaintiffs "failed to establish an injury-in-fact

15  sufficient to confer standing for their claims for damages based on injury to property rights."  *Id.*

16  at 10.  It recognized, *id.* at 6, that "at the pleading stage, the plaintiff must 'clearly … allege facts

17  demonstrating each element'" of standing—(1) a personal injury in fact; (2) that the injury was

18  likely caused by the defendant, and (3) that the injury would likely be redressed by judicial relief.

19  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (quoting *Warth v. Seldin*, 422 U.S. 490, 518

20  (1975)).  And it found that Plaintiffs had failed to demonstrate that "they themselves" had

21  suffered injury from "Copilot reproduc[ing] Plaintiffs' code as output with missing or incorrect

22  attribution, copyright notices, and license terms."  Order 8, ECF No. 95.  Plaintiffs therefore

23  lacked standing to pursue retrospective relief (*i.e.*, damages).  This Court also held that Plaintiffs

24  failed to allege facts demonstrating an injury-in-fact sufficient to confer standing for their

25  privacy-based claims.  *Id.* at 7.

26      Nevertheless, this Court held that "Plaintiffs plausibly allege that there is at least a

27  substantial risk that Defendants' programs will produce Plaintiffs' licensed code as output," and

28  that this risk "may support standing for injunctive relief."  *Id.* at 9.  The Court noted, however,

1    that "Plaintiffs do not allege they were injured by Defendants' use of licensed code as training

2    data[.]" *Id.* at 8 n.7.

3         On the merits, this Court dismissed Plaintiffs' claims for violation of § 1202(a) of the

4    DMCA, tortious interference, fraud, false designation of origin, and violation of the CCPA for

5    failure to state a claim under Rule 12(b)(6), with leave to amend. *Id.* at 16. It further dismissed

6    the unjust enrichment claim as preempted by the Copyright Act, with leave to amend. *Id.* at 17-

7    18. As to Plaintiffs' § 1202(b) claim, this Court ruled that Plaintiffs pled sufficient facts to

8    support a reasonable inference that Defendants intentionally designed the programs to remove

9    CMI from any licensed code they reproduce as output, *id.* at 19-21, but did not address GitHub

10   and Microsoft's argument that the § 1202(b) claim fails because the Complaint did not allege

11   CMI removal from an "identical copy of the work." *See* Mots. to Dismiss 13-14, ECF No. 50.

12        This Court denied Defendants' motions to dismiss the breach of contract claim, Order at

13   22, ECF No. 95. It then dismissed the UCL claims to the extent the predicate claims had been

14   dismissed, with leave to amend, *id.* at 22-23, and it further dismissed the UCL claims predicated

15   on violations of § 1202(b)(1) and (b)(3) of the DMCA, also with leave to amend, *id.* at 23. The

16   Court dismissed the civil conspiracy and declaratory relief counts with prejudice. *Id.* at 24.

17   **C.    <u>Plaintiffs' New Allegations</u>.**

18        In their Amended Complaint, Plaintiffs have joined a fifth J. Doe GitHub user as a new

19   Plaintiff and alleged eight claims for relief. Am. Compl. ¶¶ 19-23. The allegations underlying

20   Plaintiffs' claims under § 1202(b)(1) and (3), Am. Compl. ¶¶ 183-213 (Count 1), and for breach

21   of open source licenses, Am. Compl. ¶¶ 214-29 (Count 2), are largely unchanged from the initial

22   Complaint. Plaintiffs also now include claims for breach of contract for selling licensed materials

23   in violation of GitHub's policies, Am. Compl. ¶¶ 230-40 (Count 3); intentional interference with

24   prospective economic relations, Am. Compl. ¶¶ 241-53 (Count 4); negligent interference with

25   prospective economic relations, Am. Compl. ¶¶ 254-65 (Count 5); a modified unjust enrichment

26   claim, Am. Compl. ¶¶ 266-74 (Count 6); a modified unfair competition claim, Am. Compl.

27   ¶¶ 275-81 (Count 7); and a new negligence claim, Am. Compl. ¶¶ 282-89 (Count 8).

28        In support of these claims, Plaintiffs continue to allege that they "published Licensed

1   Materials they owned a copyright interest in to at least one GitHub repository under one of the

2   Suggested licenses."  Am. Compl. ¶¶ 19-23.  Plaintiffs allege that because Copilot was trained on

3   public GitHub repositories, they can be "reasonably certain" their Licensed Materials were

4   "ingested by Copilot and [are] sometimes returned to users as Output."  Am. Compl. ¶ 97.

5       New to the Amended Complaint, however, is Plaintiffs' acknowledgement that "more

6   often" than not, a snippet reproducing Plaintiffs code are snippets with "variations" from existing

7   code.  Am. Compl. ¶ 96.  Three of the Plaintiffs also allege, with respect to code in their

8   repositories, that they were able to "prompt[] Copilot" to "emit[]" their own Licensed Materials.

9   Am. Compl. ¶¶ 98, 100, 103, 110, 123, 125, 127-128.

10      In the first example, Plaintiffs prompted Copilot with a Java *enum* keyword, which is used

11  to represent (enumerate) a list of constants.  Am. Compl. § 101.  The prompt also contained the

12  name for the *enum* as ███████ followed by a line of code reflecting the specific format in

13  which the constants would be listed—namely, starting with the name of the ███████

14  ████████████████████████████."  Based on this

15  information, Copilot suggested the remaining ████████████ in the same format—

16  in the same order as Plaintiffs' own code, but also in the same order as a list widely available on

17  the internet.  *Compare* Am. Compl. ¶¶ 100-04 *with* http://en.wikipedia.org/wiki/

18  ████████████.

19      The other three examples make clear that Plaintiffs ventured far outside any ordinary use

20  of Copilot to manufacture them, and even then failed to get Copilot to produce an actual copy.  In

21  one example, Plaintiffs entered, character for character, 22 lines of Doe 1's code to yield a

22  suggested output of 18 additional lines of code, which Plaintiffs nonetheless concede "is not an

23  exact match for Doe 1's code."  Am. Compl. ¶ 108.  Plaintiffs characterize these differences as "a

24  modification *based on a copy* of Doe 1's code," Am. Comp. ¶ 108 (emphasis added)—an

25  insinuation with no supporting allegation.  But in any event, a comparison of Plaintiffs' code

26  against Copilot's output speaks for itself, demonstrating extensive differences between the two:

27

28

7

Original code:                                        Output:



Am. Compl. ¶¶ 106-07.

The same is true of the remaining two examples.  Am. Compl. ¶¶ 113-126.  Plaintiffs offer no example of a verbatim copy of code.

Although most of Plaintiffs' claims are focused on the same output-without-attribution theory Plaintiffs advanced in their initial Complaint, their claims for unjust enrichment and negligence are based on the training of Copilot itself.  *See* Am. Compl. ¶ 269 ("Defendants have unjustly utilized access to Licensed Materials hosted on GitHub to create Codex and Copilot.");

*id.* ¶ 271 ("Plaintiffs did not consent to the unauthorized use of their Licensed Materials to train Codex and Copilot."); *id.* ¶ 284 ("Defendants breached their duties by … engineering, designing, maintaining, and controlling systems—including Codex and Copilot—which are trained on Plaintiffs' and Class members' Licensed materials without their authorization.").  Plaintiffs allege that this training constitutes the creation of a "Derivative Work."  Am. Compl. ¶ 194 n.34.

ARGUMENT

**I.      THE AMENDED COMPLAINT DOES NOT ESTABLISH ARTICLE III STANDING TO PURSUE CLAIMS FOR DAMAGES.**

In their Amended Complaint, Plaintiffs attempt to manufacture the standing to seek damages that this Court found lacking in the initial Complaint.  Plaintiffs added a new Plaintiff who alleges that they were able to generate a copy of their code (after inputting many lines of their own code as a prompt), and added allegations from two other Plaintiffs claiming Copilot outputs that look like their code.  Am. Compl. ¶¶ 100-28.  Plaintiffs also attempt to predicate their claims for unjust enrichment and negligence solely on the alleged use of code in Plaintiffs' repositories to train Codex and Copilot, seemingly suggesting that training *itself* causes them injury.  Am. Compl. ¶¶ 269, 284.  Each of these artificial attempts to generate standing to pursue monetary damages fails, requiring dismissal of any request for damages under Rule 12(b)(1).

**A.      <u>Plaintiffs Cannot Manufacture Standing To Seek Damages</u>.**

***Self-inflicted "injury" cannot confer standing.***  Plaintiffs are still unable to plead facts plausibly suggesting that Copilot has ever generated a copy of Plaintiffs' code when Copilot is prompted by normal use, rather than to generate litigation-focused outputs.  None of their code is alleged to be popular or repeated elsewhere, nor well-suited to any purpose any other user may hope to satisfy when working on a coding project using Copilot.  Plaintiffs' theory of injury thus continues to rest on the bare notion that code in their repositories went *into* Copilot via training, so it could conceivably come *out of* Copilot, too.

Plaintiffs try to make this bare possibility more concrete by including several examples that they "have been able to generate" by entering prompts into Copilot.  Am. Compl. ¶ 128.  If Plaintiffs mean to suggest that these outputs themselves have injured them, that is a non-starter.

9

1    Plaintiffs may not "manufacture standing merely by inflicting harm on themselves." *Clapper v.*

2    *Amnesty Int'l. USA*, 568 U.S. 398, 416 (2013).  Such self-inflicted injuries have a traceability

3    problem—"[a] self-inflicted injury, by definition, is not traceable to anyone but the plaintiff."

4    *Buchholz v. Meyer Njus Tanick, PA*, 946 F.3d 855, 866-67 (6th Cir. 2020) (collecting authorities).

5    As one court put it in the context of a claim about misappropriation of the plaintiff's likeness,

6    "[i]t is silly to complain at length that one is devastated by the *unauthorized* use of his yearbook

7    photo to sell a product where *he orchestrated the use* and the injury may not have occurred but

8    for his initiative."  *Fry v. Ancestry.com Operations Inc.*, No. 22-CV-140 JD, 2023 WL 2631387,

9    at *5 (N.D. Ind. Mar. 24, 2023) (emphases in original).  So it is here.

10          Nor does including these examples in the Amended Complaint raise an inference that

11   Copilot has elsewhere generated copies of code in the course of ordinary use by developers other

12   than Plaintiffs.  Quite the opposite: the lengths Plaintiffs and their counsel seemingly had to go to

13   in order to conjure the four examples in the Amended Complaint weigh strongly against such an

14   inference.  Take the examples pertaining to Doe 5, the only Plaintiff who has not already been

15   ruled to lack damages standing.  The Amended Complaint alleges that by "prompt[ing]" Copilot

16   with the first *several hundred* characters of code *precisely* as it appears in Doe 5's coding project

17   on GitHub, Plaintiffs were able to get Copilot to output code that completes the function that

18   Plaintiffs asked Copilot to write in a way that is similar, but not identical, to how that particular

19   Doe coded it.  Am. Compl. ¶¶ 121-26.

20          It is impossible that any ordinary user would prompt Copilot with a precise replica of long

21   portions of Plaintiffs' code without deliberately transcribing it the way Plaintiffs did.  Plaintiffs

22   certainly do not allege that any of these prompts could ever actually occur.  In any event, it is

23   Plaintiffs' burden to establish standing, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992),

24   and so it is Plaintiffs' job to show that the examples in their Amended Complaint are somehow

25   exemplary of something that actually could have happened in real life.  They have still not

26   identified any prompt an ordinary user of Copilot would ever be likely to use that would generate

27   a copy of code in their repositories.  They therefore continue to lack standing to pursue damages.

28          ***Standing cannot be predicated on events that post-date the filing of suit.***  For Does 1 and

10

2, Plaintiffs' attempt to newly manufacture standing by including examples fails for another

reason:  "'[S]tanding is determined as of the date of the filing of the complaint.  The party

invoking the jurisdiction of the court cannot rely on events that unfolded after the filing of the

complaint to establish its standing.'"  *Wilbur v. Locke*, 423 F.3d 1101, 1107 (9th Cir. 2005)

(alteration adopted), *abrogated on other grounds by Levin v. Commerce Energy, Inc.*, 560 U.S.

413 (2010).  Plaintiffs were all adjudged to lack standing to pursue damages based on the facts

alleged in the initial Complaint.  The only additional facts in the Amended Complaint that even

conceivably go to Plaintiffs' claimed injury are the artificially manufactured examples, all of

which appear to have been created after this Court dismissed Plaintiffs' damages claims.  A

plaintiff may not belatedly amend the jurisdictional facts to generate standing where none was

present at the time the Complaint was filed.  *See Newman-Green, Inc. v. Alfonzo-Larrain*, 490

U.S. 826, 831 (1989).

> ***Plaintiffs identify no cognizable injury from training.***  In its ruling on the prior motions
> to dismiss, this Court noted Plaintiffs' "suggest[ion] [that] they were also injured by Defendant's
> use of Plaintiffs' licensed code as training data."  Order 8 n.7, ECF No. 95.  But it found that
> Plaintiffs had failed to "describe such an injury."  *Id.*  And indeed, at the hearing on Defendants'
> motions, this Court repeatedly explained that "[i]f the training had occurred and then nothing else,
> this case would not be here."  Tr. 23.  The Court expressed "difficulty in understanding how the
> training aspect of this product injures anybody's rights," noting that if any person could freely log
> onto GitHub to view code in public repositories, "why can't a software program do the same
> thing?"  Tr. 27-28.  And when the Court asked whether training alone could violate any
> attribution requirement in any applicable open-source license, Plaintiffs' counsel could only
> respond "Perhaps it doesn't."  Tr. 31.

> Nevertheless, Plaintiffs now appear to predicate two claims for unjust enrichment (Count
> 6) and Negligence (Count 8) on the act of training alone.  These claims are highly dubious on the
> merits, as discussed below.  But even if they were not, Plaintiffs still fail to allege any cognizable
> injury to them that would result from the mere training of a generative AI model based, in part, on
> code contained in Plaintiffs' repositories.  Plaintiffs do not even try to allege how they have been

harmed by use of code in their public repositories to train a machine learning model.  They do not

identify a "concrete, particularized" invasion of a recognized legal interest that is violated merely

by a software program viewing and learning from data that is publicly available on the internet.

And Plaintiffs suggest no harm that would flow from the fact that an algorithm happens to exist

that was in part trained on code Plaintiffs chose to make publicly available to anyone.  Standing

to seek damages for purposes of Counts 6 and 8 therefore cannot be predicated on training.

**B.**   **All Requests For Or Assertions Of Entitlement To Monetary Relief Should Be Dismissed.**

Because Plaintiffs lack standing to seek damages, all requests for or assertions of

entitlement to such relief should be dismissed from the case.  This includes including Plaintiffs'

allegations concerning a putative "Damages Class," Am. Compl. at 9:13-16, which no named

Plaintiff can represent.  *See Hawkins v. Comparet-Cassani*, 251 F.3d 1230, 1238 (9th Cir. 2001)

("A named plaintiff cannot represent a class alleging … claims that the named plaintiff does not

have standing to raise.").

The Amended Complaint also includes prayers for punitive damages in connection with

their interference with economic advantage, unjust enrichment, unfair competition, and

negligence claims, which should independently be dismissed pursuant to Rule 12(b)(6).  Under

California law, punitive damages are available only upon a showing of "oppression, fraud, or

malice," which require some form of intentionally injurious, "despicable," or intentionally

misleading conduct.  Cal. Civ. Code § 3294(a), (c); *see GBTI, Inc. v. Ins. Co. of Pa.*, No. CV F

09-1173, 2009 WL 2365409, *6 (E.D. Cal. July 29, 2009) (collecting authorities on pleading

requirements for punitive damages under § 3294)  Plaintiffs include no non-conclusory

allegations that GitHub or Microsoft engaged in the intentionally wrongful behavior required, so

their punitive damages request should be dismissed under Rule 12(b)(6).  *E.g.*, *Rhynes v. Stryker*

*Corp.*, No. 10-5619 SC, 2011 WL 2149095, *6 (N.D. Cal. May 31, 2011) (dismissing punitive

damages request based only on "conclusory allegations"); *Vermillion v. Corrections Corp. of*

*Am.*, No. CV F 08-1069, 2008 WL 4058063, *11 (E.D. Cal. Aug. 28, 2008) (similar).

## II.   PLAINTIFFS' DMCA CLAIMS FAIL BECAUSE PLAINTIFFS DO NOT ALLEGE REMOVAL OR ALTERATION OF CMI FROM IDENTICAL COPIES OF WORKS.

In resolving Defendants' previous motions to dismiss Plaintiffs' copyright management information claims, this Court granted the motions as to § 1202(a) and (b)(2), but denied the motions as to § 1202(b)(1) and (b)(3)—both of which involve removal or alteration of CMI. Order 16, 18-21, ECF No. 95.  Plaintiffs have not attempted to amend the dismissed claims, repleading only their removal or alteration claims.  Am. Compl. ¶¶ 183-213.  GitHub and Microsoft preserve all rights as to those claims, but do not seek to relitigate issues this Court has already resolved.  GitHub and Microsoft respectfully ask the Court to address a defect in Plaintiffs' claims that it did not reach in its previous order, and one that is only more pronounced in light of Plaintiffs' Amended Complaint: § 1202(b) claims lie only when CMI is removed or altered from an identical copy of a copyrighted work.  *See* Mots. To Dismiss 13-14, ECF No. 50 at 13-14 (Microsoft and GitHub's motions arguing that removal from an "identical copy of the work" is required).  Plaintiffs fail to plead this identical copy requirement as to any of their claimed works.

Courts have consistently rejected § 1202(b) claims where the copy from which CMI is allegedly removed is merely an excerpt or modification of the original copy.  This includes § 1202(b) claims based on mere "framing" of a photograph in a way that does not include CMI, *id.*; excerpting lecture notes and study questions from textbooks without reproducing CMI, *Faulkner Press, L.L.C. v. Class Notes, L.L.C.*, 756 F. Supp. 2d 1352, 1356, 1359 (N.D. Fla. 2010); copying "aspects" of architectural works but "omitting" the plaintiff's CMI, *Design Basics, LLC v. WK Olson Architects, Inc.*, No. 17 C 7432, 2019 WL 527535, at *5 (N.D. Ill. Feb. 11, 2019); *Frost-Tsuji Architects v. Highway Inn, Inc.*, No. CIV. 13-00496, 2015 WL 263556, at *3 (D. Haw. Jan. 21, 2015), *aff'd*, 700 F. App'x 674 (9th Cir. 2017); or incorporating the underlying content from the original copy into some different form or distinct work without CMI, *Kelly v. Arriba Soft Corp.*, 77 F. Supp. 2d 1116, 1122 (C.D. Cal. 1999) (thumbnail versions of images)*, rev'd on other grounds*, 336 F.3d 811 (9th Cir. 2003).

This identical-copy requirement makes sense in light of the overarching purpose of

§ 1202(b).  That statute was enacted to create so-called paracopyright protections, "assist[ing] in tracking and monitoring uses of copyrighted works, as well as licensing of rights and indicating attribution, creation and ownership."  S. Rep. No. 105-190 (1998) at 16.  That is why CMI is defined not as any information conveyed with any content, but specifically as "information conveyed in connection with copies … of a work."  17 U.S.C. § 1202(c).  Were it otherwise, what was intended as a narrow paracopyright protection would swallow copyright protection whole, allowing plaintiffs to plead "removal" of CMI from mere snippets of a work that may have no claim to any copyright protection at all.

Plaintiffs' Amended Complaint lays this danger bare.  In their initial Complaint, Plaintiffs were coy about what sort of code they were suggesting Copilot might emit without attribution in violation of § 1202(b).  But the Amended Complaint's examples show how broad—and legally untenable—their theory is.  In the example pertaining to Doe 2, Plaintiffs caused Copilot to emit a list of the ████████████████████████████████████████████████████████ ██████████████.  Am. Compl. ¶¶ 100-04.  Plaintiffs do not allege that this list of ███████ constitutes a full, identical copy of a work in which they have an interest.  Nor could they claim rights in it, since this "code" is merely a table of constants, which constants happen to be the ███████████████████ and which table happens to mirror the one contained in the Wikipedia article ██████████████████████████████████████████ ██████████████.  *See* http://en.wikipedia.org/wiki/████████████████████.  Yet Plaintiffs seem to be suggesting that if Doe 2 is not credited as the author of this obviously uncopyrightable code snippet, Defendants have violated § 1202(b).

This fundamental defect is endemic to Plaintiffs' theory of § 1202(b) liability.  As the Amended Complaint acknowledges, Copilot's output is limited to short passages of code representing suggested completions for coding processes initiated by a user.  *Supra* 4.  Copilot's output will therefore virtually never constitute an identical copy of a work.  Moreover, the Amended Complaint acknowledges that suggested snippets are "more often" "modified or adapted"—that is, expressed with differences based on the patterns the model has internalized across the training set.  Plaintiffs' § 1202(b) theory would embrace *all of this*, ostensibly by

treating every output Copilot generates that *resembles* code in Plaintiffs' repository as a "Derivative Work" from which CMI has been removed.

That theory is wrong on the law.  As the case law above demonstrates, § 1202(b) is about identical "copies … of a work"—not about stray snippets and adaptations.  And Plaintiffs' theory also cannot be squared with the Amended Complaint's own allegations about how Copilot actually works.  Though Plaintiffs' brand Copilot a rote copy-paste machine that cannot understand code, their examples actually show that it does not *copy* anything, but rather generates suggestions afresh based on what it has discerned across a training set.  (How else would it decide to use the terms █████████████████████████████████████████████████████████ ? *See* Am. Compl. ¶ 103 (Plaintiffs acknowledging these variations on Copilot output).)  This Court should dismiss the § 1202(b) claims because Plaintiffs have not alleged that Copilot removes CMI from identical copies of Plaintiffs' works.

### III.    PLAINTIFFS' TORT CLAIMS ARE PREEMPTED BY THE COPYRIGHT ACT.

Plaintiffs' state-law tort claims are all preempted by the Copyright Act because they are built on the allegation that Defendants, without authorization, copied, distributed, and created derivative works from code in Plaintiffs' repositories.  This includes Plaintiffs' claims for tortious and negligent interference with economic advantage (Counts 4 and 5), unjust enrichment and negligence (Counts 6 and 8), and unfair competition to the extent based on state law tort claims (Count 7, Am. Compl. ¶ 276(c), (d)).

Section 301 of the Copyright Act preempts "legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright … and come within the subject matter of copyright."  17 U.S.C. § 301(a).  Courts evaluate copyright preemption under a "two-part test," holding state law claims preempted where (1) "the 'subject matter' of the state law claim falls within the subject matter of copyright as described in 17 U.S.C. §§ 102 and 103"; and (2) "the rights asserted under state law are equivalent to the rights contained in 17 U.S.C. § 106." *Maloney v. T3Media, Inc.*, 853 F.3d 1004, 1010 (9th Cir. 2017) (quotation marks omitted).

The subject matter requirement of the test is plainly satisfied.  Plaintiffs' tort claims all involve Plaintiffs' claimed copyright interests in computer code, which constitutes a "literary

work" under § 102.  *See Google*, 141 S. Ct. at 1196.  These claims therefore involve the "subject matter" of copyright, a result that obtains even if the code is not actually protected by the Copyright Act.  *See Montz v. Pilgrim Films & Television, Inc.*, 649 F.3d 975, 979 (9th Cir. 2011) (en banc) ("[T]he scope of the subject matter of copyright law is broader than the protections it affords.").

The equivalent-rights prong is also met with respect to each claim.  When Defendants raised preemption in response to various claims in the initial Complaint, Plaintiffs did not even respond—doubtless because their claims quoted nearly verbatim from the Copyright Act's list of exclusive rights.  *See* Order 17, ECF No. 95 ("Plaintiffs' opposition generally does not address Defendants' preemption arguments.").  This Court recognized as much in finding Plaintiffs' unjust enrichment claim preempted:  "Plaintiffs base their unjust enrichment claim on Defendants' reproduction of Plaintiffs' code as output and Defendants' preparation of derivative works, both of which are rights protected under the Copyright Act."  *Id.* at 17-18.  Although Plaintiffs replead their tort claims without using copyright language, the substance of the allegations shows that Plaintiffs' tort claims remain mere copyright claims in disguise.

Plaintiffs' interference with economic advantage claims are not based on any existing or specific economic opportunity.  Plaintiffs claim that GitHub and Microsoft are interfering with their rights to form contracts with the "global open-source community" by "emitting code subject to open-source licenses without the licenses attached."  Am. Compl. ¶ 250.  This claim at bottom is based on the theory that Plaintiffs have a tort-based exclusive right to control the reproduction and distribution of certain code to the general public, and that Defendants are interfering with those rights.  That is a copyright claim.  *See Crafty Prods., Inc. v. Fuqing Sanxing Crafts Co.*, 839 F. App'x 95, 98-99 (9th Cir. 2020) (tortious interference claim preempted); *Harper & Row Publishers, Inc. v. Nation Enters.*, 723 F.2d 195, 201 (2d Cir. 1983) (tortious interference claim preempted where "unauthorized publication is the gravamen of the[] claim"), *rev'd on other grounds*, 471 U.S. 539 (1985).

It makes no difference that Plaintiffs also append the qualifier "without the licenses attached."  Am. Compl. ¶ 250.  That is just another way of saying that Plaintiffs have not

1   authorized the reproduction or distribution of code in the manner they claim Defendants have

2   engaged in.  The claims are still, at bottom, based on reproduction and distribution—they are not

3   qualitatively different merely because Plaintiffs also allege that the reproduction and distribution

4   was unauthorized.  Were it otherwise, a plaintiff could use state-tort law to dramatically curtail

5   public domain rights the Copyright Act seeks uniformly to protect.  As the Supreme Court has

6   explained, absent copyright protection, "the public may use the … work at will and without

7   attribution."  *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 34 (2003).

8   Plaintiffs' rights to control reproduction and distribution to the "global … community" therefore

9   lie in the Copyright Act or perhaps contract—but they cannot be derived from state tort-law.

10       Plaintiffs' unjust enrichment and negligence claims, meanwhile, are based on the

11   exclusive right "to prepare derivative works."  17 U.S.C. § 106.  Both claims appear to target the

12   training of Codex and Copilot.  Am. Compl. ¶ 269 ("Defendants have unjustly utilized access to

13   Licensed Materials hosted on GitHub to create Codex and Copilot."); *id.* ¶ 271 ("Plaintiffs did not

14   consent to the unauthorized use of their Licensed Materials to train Codex and Copilot."); *id.*

15   ¶ 284 ("Defendants breached their duties by … engineering, designing, maintaining, and

16   controlling systems—including Codex and Copilot—which are trained on Plaintiffs' and Class

17   members' Licensed materials without their authorization.").  Plaintiffs explicitly allege,

18   moreover, that Copilot is a derivative work: "The definition [of Derivative Works] also includes

19   the Copilot product itself, which is a Derivative Work based upon a large corpus of Licensed

20   Materials."  Am. Compl. ¶ 194 n.34.  So, by the terms of Plaintiffs' own allegations, the conduct

21   underlying their unjust enrichment and negligence claims is the preparation of a derivative work.

22   It is therefore preempted.  *See* Order 17, ECF No. 95 (finding preemption of unjust enrichment

23   claim based upon preparation of a derivative work).

24       Lastly, insofar as Plaintiffs' UCL claim is predicated on the above state-law torts, it too is

25   preempted.  *See Maloney*, 853 F.3d at 1019 (holding UCL claim preempted); *Kodadek v. MTV*

26   *Networks, Inc.*, 152 F.3d 1209, 1213 (9th Cir. 1998) (same).

27

28

17

1    **IV.   THE TORT CLAIMS ARE DEFECTIVE FOR OTHER REASONS AS WELL.**

2         **A.   Plaintiffs Fail To Identify Applicable State Law For Their Common Law**
              **Claims.**

3
               In its order on Defendants' motions to dismiss the initial Complaint, this Court noted

4    Plaintiffs' failure to "identify the state law which applies to each" of its common law tort claims

5    and directed Plaintiffs "in any future amended complaint … [to] identify the state under whose

6    law the claim is brought."  Order 4 n.5, ECF No. 95.  Plaintiffs have failed to comply with this

7    Court's directive with respect to their common law tort claims for intentional interference with

8    prospective economic relations, negligent interference with prospective economic relations,

9    unjust enrichment, unfair competition, and negligence.  This is "grounds for dismissal."  *Id.*

10   (quoting *In re Nexus 6P Prods. Liab. Litig.*, 293 F. Supp. 3d 888, 933 (N.D. Cal. 2018) (quotation

11   marks omitted)).

12        **B.   Plaintiffs Fail To State A Claim For Intentional Or Negligent Interference**
              **With Economic Relations.**

13

14             Plaintiffs do not replead their original tortious interference with contractual relations

15   claim.  Instead, they replace it with claims for intentional and negligent interference with

16   prospective economic relations (Counts 4 and 5).  Although "[t]ortious interference with

17   prospective economic advantage … does not depend on the existence of a legally binding

18   contract," it still requires a plaintiff to show that the defendant interfered with a specific

19   "economic relationship between the plaintiff and some third party, which carries the probability

20   of future economic benefit to the plaintiff."  *Ixchel Pharma, LLC v. Biogen, Inc.*, 9 Cal. 5th 1130,

21   1141 (2020) (alterations adopted).  For both claims, Plaintiffs must identify specific, known

22   relationships and plausibly allege the probability of concrete future economic benefit from the

23   identified relationship.  *Westside Ctr. Assocs. v. Safeway Stores 23, Inc.*, 42 Cal. App. 4th 507,

24   523-28 (1996); *Rosen v. Uber Techs., Inc.*, 164 F. Supp. 3d 1165, 1178-79 (N.D. Cal. 2016).  The

25   only "difference between intentional interference and negligent interference with prospective

26   economic advantage relates to the defendant's intent."  *Crown Imports, LLC v. Super. Ct.*, 223

27   Cal. App. 4th 1395, 1404 n.10 (2014).

28             Here, the Amended Complaint does not identify any specific business expectancy or third-

18

1   party relationship with which GitHub and Microsoft allegedly interfered.  The Amended

2   Complaint merely alleges that Defendants affected Plaintiffs' relationships with the "global open-

3   source community" and interfered with Plaintiffs' vague expectation that unidentified

4   "programmers would use, modify, copy or otherwise iterate on their posted code subject to the

5   terms of the open-source licenses the code was published subject to."  Am. Compl. ¶¶ 247, 258,

6   260.  It is well-settled, however, that a plaintiff cannot base an economic interference claim on

7   abstract interference with opportunity in "the market" generally or on vague "lost

8   opportunit[ies]."  *Westside Ctr. Assocs.*, 42 Cal. App. 4th at 527.  Instead, Plaintiffs must identify

9   specific relationships with specific third-parties and plausibly allege that defendant "knew of the

10  existence of the relationship."  *Id.* at 526; *see O'Connor v. Uber Techs., Inc*., 58 F. Supp. 3d 989,

11  998 (N.D. Cal. 2014) ("[I]nterference with potential" third parties "with whom the plaintiff did

12  not have an existing relationship generally is not sufficient to state a claim.")  Allowing the claim

13  to proceed based on Plaintiffs' allegation that "programmers" generally would use open-source

14  code differently absent Defendants' actions would "allow[] recovery no matter how speculative

15  the plaintiff's expectancy."  *Rosen*, 164 F. Supp. 3d at 1179.

16          Nor do Plaintiffs plausibly allege that these unspecified relations in fact carried the

17  likelihood of generating "future economic benefit."  *Ixchel*, 9 Cal. 5th at 1141.  Plaintiffs vaguely

18  allege that Defendants caused them to miss out on "substantial benefits" that come with "the

19  creation and distribution of open-source code subject to these open-source licenses," Am. Compl.

20  ¶ 243; "prevented Copilot users from becoming part of the user communities that would

21  ordinarily accrete around the open-source projects of Plaintiffs and the Class," Am. Compl.

22  ¶ 249; and prevented them from "optimiz[ing] the likelihood of accruing communities of other

23  GitHub customers for their own projects," Am. Compl. ¶ 256.  But the Amended Complaint does

24  not allege how actual "future economic benefits" would have flown to Plaintiffs from their

25  "becoming part of the user communities" or engaging in "open-source distribution" in the

26  absence of Defendants' challenged conduct.  Instead, it "assumes what normally must be proved,

27  i.e., that it is reasonably probable the plaintiff would have received" a concrete "expected benefit

28  had it not been for the defendant's interference."  *Rosen*, 164 F. Supp. 3d at 1179.  The Amended

19

1  Complaint's assertions that Defendants "deprive[d] Plaintiffs of the economic benefits of open-

2  source distribution," Am. Compl. ¶ 262, and "the future economic benefits likely to arise from

3  those relationships," Am. Compl. ¶ 246, are thus paradigmatic conclusory allegations that fail to

4  state a claim.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

5     The Amended Complaint also fails to plausibly allege "actual disruption" or specific

6  "harm," two additional elements of the claims.  *Korea Supply Co. v. Lockheed Martin Corp.*, 29

7  Cal. 4th 1134, 1153 (2003).  As a result, the Amended Complaint does not state a claim for any

8  economic interference tort.

9     C.  <u>**Plaintiffs' New Attempt At An Unjust Enrichment Claim Does Not Cure Its**</u>

10  <u>**Defects.**</u>

11     Under California law, the only form of independent claim sounding in unjust enrichment

12  is "a quasi-contract claim seeking restitution."  *ESG Cap. Partners, LP v. Stratos*, 828 F.3d 1023,

13  1038 (9th Cir. 2016) (citation omitted).  "However, 'to allege a quasi-contract claim, a party must

14  plausibly allege the absence of any applicable and enforceable contract provisions, even if in the

15  alternative.'"  *In re Bang Energy Drink Mktg. Litig.*, No. 18-cv-05758, 2020 WL 4458916, at *10

16  (N.D. Cal. Feb. 6, 2020) (quoting *City of L.A. v. Sprint Sols., Inc.*, No. 17-cv-00811, 2019 WL

17  5568879, at *9 (E.D. Cal. Oct. 29, 2019)).  But Plaintiffs have not anywhere "alternatively

18  alleged the absence of such provisions," *id.*, so this claim should be dismissed for that reason

19  alone.

20     The claim additionally fails for the reason that Plaintiffs have not alleged how Defendants

21  benefited at their expense.  *See Stratos*, 828 F.3d at 1038 ("To allege unjust enrichment as an

22  independent cause of action, a plaintiff must show that the defendant received and unjustly

23  retained a benefit at the plaintiff's expense.").  Plaintiffs say that "[b]y using Plaintiffs' Licensed

24  Materials to train Codex and Copilot, Plaintiffs and the Class were deprived of the benefits of

25  their open-source licenses, including monetary damages."  Am. Compl. ¶ 270.  But Plaintiffs

26  have not alleged any injury based on training.  *See also* Order at 8 n.7, ECF No. 95  ("Plaintiffs

27  do not allege they were injured by Defendants' use of licensed code as training data[.]").  Even

28  construed as a claim based on output, the unjust enrichment claim fails because Plaintiffs have

not alleged that any Copilot user other than themselves has ever prompted Copilot to suggest code that is a copy of theirs.  *See supra* 9-10.

### D.  Plaintiffs Have Not Alleged The Deprivation Of Money Or Property Required To Make A UCL Claim.

Plaintiffs duplicate their DMCA, open-source license, and tort claims as purported violations by GitHub of California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.* (Count 7).  This is dead on arrival.  The "UCL's standing requirements" are "more stringent than the federal standing requirements" and require a showing of "lost money or property."  *Kwikset Corp. v. Super. Ct.*, 51 Cal. 4th 310, 324 (2011); Cal. Bus. & Prof. Code § 17204.

The Amended Complaint does not plausibly allege the required "lost money or property."  Cal. Bus. & Prof. Code § 17204.  It asserts that "Plaintiffs and the Class have suffered economic injury as a result of Defendants' conduct."  Am. Compl. ¶ 281.  But the Amended Complaint does not allege any factual theory of *how* Plaintiffs suffered monetary loss as a result of the training of Copilot or its suggestions, let alone any specific allegations supporting such a theory.  All they state is that "there are economic benefits to the creation of open-source works such as generating market share for programs, increasing national or international reputation by incubating open-source projects, and deriving value from improvements to software based on suggestions by end-users."  Am. Compl. ¶ 281.  This general observation provides no explanation of how Defendants' conduct caused them to lose "money or property."  Plaintiffs therefore offer only a "[t]hreadbare recital[]" of the UCL's "stringent" standing element "devoid of 'further factual enhancement,'" which "do[es] not suffice."  *Iqbal*, 556 U.S. at 678 (citation omitted).

### E.  Plaintiffs' Negligence Claim Fails To Identify Any Legal Duty Sounding In Tort.

Plaintiffs' negligence claim should be dismissed for lack of plausible allegations of duty and injury.  "The existence of a duty of care owed by a defendant to a plaintiff is a prerequisite to establishing a claim for negligence."  *Langan v. United Servs. Auto. Ass'n*, 69 F. Supp. 3d 965, 987 (N.D. Cal. 2014) (quoting *Nymark v. Heart Fed. Savings & Loan Ass'n.*, 231 Cal.App.3d

1089, 1095 (1991)).  Plaintiffs allege "Microsoft and GitHub also owed its user a duty of care not to itself use the Licensed Materials in a way that would foreseeably cause Plaintiffs and Class members injury, for instance, by using Licensed Materials to train Copilot."  Am. Compl. ¶ 286. This apparent duty is grounded in "Defendants' relationship" to Plaintiffs, including "Defendants' contractual obligations, custom and practice, right to control information in its possession, exercise of control over the information in its possession, authority to control the information in its possession, and the commission of affirmative acts that resulted in said harms and losses." Am. Compl. ¶ 283.  But *all of* these ostensible sources of duty are in fact grounded in the "contractual obligations" (and rights) that define the terms of users' relationship with GitHub. And that forecloses any tort-based duty, because it is settled California law that a duty in tort cannot be derived from obligations in a contract absent some "special relationship" recognized in law—which Plaintiffs do not and cannot claim here.  *See Foley v. Interactive Data Corp.*, 47 Cal. 3d 654, 682-94 (1988).

Moreover, any alleged violation of duty predicated on *training* Copilot with code published in public GitHub repositories, it is expressly *foreclosed* by GitHub's Terms of Service. Am. Compl. Ex. 1.  GitHub's TOS expressly authorizes the training of Copilot.  The TOS informs users that "You own content you create, but you allow us certain rights to it."  Am. Compl. Ex. 1 at 27 (TOS at 6).  "These license grants apply to Your Content" when uploaded to GitHub, notwithstanding any other license terms that might be attached.  *Id.*  Every GitHub user chooses whether to allow their "repositories to be viewed publicly."  *Id.*  No user is required to make a repository public.  If they choose to do so, they "grant [GitHub] … the right to store, archive, parse, and display" publicly posted content and "make incidental copies, as necessary to provide the Service, including improving the Service over time."  *Id.*  This includes the right to "copy" public material "to our database," "parse it into a search index or otherwise analyze it on our servers," and "share it with other users."  *Id.* at 27-28 (TOS at 6-7).  The "Service" includes all "the applications, software, products, and services provided by GitHub," *id.* at 24 (TOS at 3), which includes Copilot.  *See* Am. Compl. ¶ 8; Am. Compl. Ex. 1 at 23, 37 (TOS at 3, GitHub Copilot Terms).

As Plaintiffs allege, Copilot functions by evaluating the code contained in GitHub's public repositories, Am. Compl. ¶¶ 86-87, in order to "infer[] statistical patterns governing the structure of code." Am. Compl. ¶ 56. That activity is squarely encompassed by the contractual authorization, from every public code repository owner, for GitHub to "store, archive, parse, and display" publicly posted content "as necessary to provide … the applications, software, products, and services provided by GitHub" and to "analyze it on our servers." Am. Compl. Ex. 1 at 26-27, 23 (TOS at 6-7, 3). Even if the Amended Complaint put forward any plausible theory of how inspection and analysis of publicly posted material violated an open source license provision, Plaintiffs' acceptance of the GitHub TOS forecloses a claim for breach of contract based on Copilot's training on the public code. "Dismissal is … proper where the complaint alleges facts that demonstrate that the [claim] is barred as a matter of law." *Orchard Supply Hardware LLC v. Home Depot USA, Inc.*, 967 F. Supp. 2d 1347, 1354 (N.D. Cal. 2013). So it is here.

Plaintiffs also fail to allege any injury. Plaintiffs assert Defendants' "breach of their duties," "by using open-source code in violation of open-source licenses to train Codex and Copilot," "proximately caused Plaintiffs and Class members injuries," Am. Compl. ¶¶ 287-88, but they do "not allege *how*" they were "injured by such conduct nor what damages [Plaintiffs] sustained from such conduct." *West v. City & Cnty. of S.F.*, No. 21-cv-02370, 2022 WL 1556415, at *13 (N.D. Cal. May 17, 2022) (emphasis added). Count 8 should be dismissed.

## CONCLUSION

The Court should grant the motions to dismiss portions of the Amended Complaint.

Dated: June 29, 2023

Orrick, Herrington & Sutcliffe LLP

By:   *_____ /s/ Annette L. Hurst _____*
ANNETTE L. HURST
Attorneys for Defendants
GitHub, Inc. and Microsoft Corp.