**Pages 1 - 33**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Jon S. Tigar, Judge

J. DOE 1, ET AL.,                  )
                                   )
            Plaintiffs,            )
                                   )
  VS.                              )     **NO. CV 22-06823-JST**
                                   )
GITHUB, INC., ET AL.,              )
                                   )
            Defendants.            )
_____   )


                        Oakland, California
                        Thursday, November 9, 2023


                **TRANSCRIPT OF PROCEEDINGS**


**APPEARANCES**:

For Plaintiffs:
                        JOSEPH SAVERI LAW FIRM, LLP
                        601 California Street, Suite 1000
                        San Francisco, CA 94108
                  BY:   **JOSEPH R. SAVERI, ESQUIRE**

                        LAW OFFICES OF MATTHEW BUTTERICK
                        1920 Hillhurst Avenue, No. 406
                        Los Angeles, CA 90027
                  BY:   **MATTEW BUTTERICK, ESQUIRE**

For Defendants Microsoft Corporation and GitHub, Inc.:
                        ORRICK HERRINGTON & SUTCLIFFE LLP
                        405 Howard Street
                        San Francisco, CA 94105
                  BY:   **ANNETTE L. HURST, ESQUIRE**




Reported By:    Pamela Batalo-Hebel, CSR No. 3593, RMR, FCRR
                Official Reporter

**APPEARANCES CONTINUED:**

For Defendants OpenAI, Inc., OpenAI, L.P., OpenAI GP, L.L.C.,
OpenAI Startup Fund GP I, L.L.C., OpenAI Startup Fund I, L.P.,
OpenAI Startup Fund Management, LLC, OpenAI OpCo, L.L.C.:
                        MORRISON & FOERSTER LLP
                        425 Market Street
                        San Francisco, CA 94105
          **BY:   JOSEPH GRATZ, ESQUIRE**

<u>**Friday - November 9, 2023**</u>                                    **2:05 p.m.**

## P R O C E E D I N G S

### ---o0o---

**THE CLERK:**  Your Honor, now calling CV 22-6823-JST,
Doe 1, et al. vs. GitHub, Inc., et al.

If counsel could please state their appearances for the
record, starting with counsel for plaintiffs.

**MR. SAVERI:**  Good afternoon, Your Honor.  Joseph
Saveri on behalf of the plaintiffs.  Matthew Butterick is in my
office with me in San Francisco.

**THE COURT:**  Very good.  Welcome.

**MR. BUTTERICK:**  Good afternoon.

**MR. GRATZ:**  Good afternoon, Your Honor.  Joe Gratz for
the OpenAI defendants.

**MS. HURST:**  Good afternoon, Your Honor.  Annette Hurst
for Microsoft and GitHub.

**THE COURT:**  Mr. Gratz and Ms. Hurst, have you talked
about how, if at all, you're going to divide up your arguments?

**MR. GRATZ:**  We have, Your Honor.

**THE COURT:**  And what conclusions did you come to in
that regard?

**MR. GRATZ:**  The conclusions we came to, Your Honor, is
that there are a number of issues at rest in the briefs that
I'm going -- I'm going to be starting.  There are a number of
the issues that I am planning to handle, though I will answer

1    whatever Your Honor wants to ask me, and then Ms. Hurst will

2    have some more, and then we will save some time for rebuttal.

3        **THE COURT:**   Okay.   The reason I ask the question is to

4    determine whether I could just hand out equal time allotments

5    to each side because you and Ms Hurst have divided up the

6    issues, or whether you feel the need to make overlapping

7    arguments on behalf of your separate clients, in which case I

8    should think about doing something else.   That's why I asked

9    the question.

10       **MR. GRATZ:**   Your Honor, I don't think we are expecting

11   to make arguments that -- that differ materially and

12   importantly such that we would need additional time.

13       **THE COURT:**   Very good.

14       Twenty-five minutes to each side.   The defendants can save

15   some for rebuttal.   Actually, I think we did this before, too.

16   I think why don't I give each side two rounds.   If we think of

17   it, we might let you know what's happening with your time.   We

18   might not do that, and so if you want to save time for rebuttal

19   argument, just stop talking before 25 minutes.

20       Mr. Gratz, it sounds like you are going to lead things off

21   for the defendants, so we'll turn the microphone over to you.

22       **MR. GRATZ:**   Great.   Thank you, Your Honor.   I'm going

23   to attempt to occupy 10 minutes of our time and turn it over

24   and see what we can save.

25       Good afternoon, Your Honor.   Joe Gratz from Morrison &

1  Foerster for OpenAI.

2       The first issue I would like to address, unless Your Honor

3  wishes to direct us elsewhere, is the issue of standing for

4  damages and particularly the role that the amendments to the

5  Complaint and the examples that are provided play in that -- in

6  that -- in that analysis.

7       **THE COURT:**  I think -- I think the three most

8  interesting things today are that issue, the question of

9  whether a copy needs to be identical, and whether Mr. Saveri

10  can get me to see things his way on what "use" means for the

11  purposes of preemption.  I think those are the three -- I mean,

12  there is a lot of little stuff, but I think those are the three

13  big things.

14       **MR. GRATZ:**  I agree with you, Your Honor.  Let me

15  start with the first one.

16       It is a rare case where adding more allegations makes

17  plaintiffs' ability to show standing worse, but we think that

18  is what happened here.

19       The claims of monetary damages in the previous Complaint

20  were dismissed because there was only a risk of future harm,

21  not plausible past harm, and so we got these examples, and we

22  don't think they make past harm any more plausible; indeed, we

23  think they make that past harm less plausible.

24       So if you need to do this to make it output something

25  pretty close to the plaintiffs' code and it's facially

1    implausible that anybody would do this, then it's not plausible

2    that anybody did something in the past that caused the output

3    of something pretty close to plaintiffs' code.

4         In other words, the Complaint doesn't answer the question

5    why is it plausible that anyone ever would have done that in

6    the past.  It's -- it's like the Henny Youngman joke about the

7    guy who goes to the doctor and says, "Doctor, if I bend over

8    this way and wiggle my arm that way and stick out my arm this

9    way, I get a bad pain in my back," and the doctor says, "Why

10   would you do that?  Don't do that."  Right?

11        That is what we see as what is going on in these examples

12   because there isn't any reason that somebody without the

13   plaintiffs' code already in front of them would do the thing

14   that the plaintiffs did to generate these examples.

15        I'm happy to go through the examples specifically and talk

16   about why that is the case for each one, and I will attempt to

17   do that without -- without using such specifics that we need to

18   seal the proceeding or the courtroom.

19        So, for example, in paragraph 102 of the Complaint, you --

20   you only have to give it a couple of lines, but you are giving

21   it enough to know what format you're using and then it gives

22   you back a list of facts.  And those facts, as we know in our

23   motion, are presented in the format that was given by the

24   prompt, and they are given -- provided in the order that is

25   given by Wikipedia for those facts.

1      **THE COURT:**  Does it concern you at all that the

2  Wikipedia reference that you both like so much is outside the

3  pleadings?

4      **MR. GRATZ:**  It does not, Your Honor.

5      **THE COURT:**  Might I say that makes one of us?

6      **MR. GRATZ:**  Very good.  Let me -- let me -- let me --

7  let me --

8      **THE COURT:**  We're kind of all ears looking for that

9  kind of thing at the 12(b)(6) stage because people try to slip

10  stuff in all the time, so when we think they've done that, it's

11  good to provide an explanation that what I think has just

12  happened didn't happen.

13      **MR. GRATZ:**  So, Your Honor, the -- the fact that it is

14  the same order as on Wikipedia is, I think, subject to judicial

15  notice because the only fact is the ordering, but, also,

16  Your Honor, it points out why the allegation they make isn't

17  sufficient; right?

18      The allegation they make is this is in an order that is

19  not dictated by the data itself, which may be true but doesn't

20  add up to a plausible allegation that there's something there

21  that they have a plausible claim to own.

22      Moving on, if I may, to the second example, which starts

23  in paragraph 107, you have to give it 20 lines to have it come

24  up with something pretty similar, and -- two items about that.

25  One, if you can give it those 20 lines, you've already got it

1  in front of you; and, second, the first 20 lines, of course,

2  imply the rest, even if you've never seen the rest.  And I

3  apologize for the -- for the slight vagueness of my example,

4  but I don't want to --

5      **THE COURT:**  I read your brief closely.  I have the

6  examples in mind.  That's fine.

7      **MR. GRATZ:**  The -- and the last one, just to highlight

8  it, the example starting at paragraph 116, gives you an example

9  of a kind of test and then gives you the name of another test

10  that tells you exactly what's different from the first example.

11  And then it gives you the first thing except different in the

12  way that was specified in English in that line.  And, indeed,

13  in this example, as we'll talk about when we get to discussing

14  identicality, almost everything that could be different is

15  different while doing the same thing.  The variable name is

16  different, for example.

17      And so that's why we think the examples, far from showing

18  why it's plausible that the plaintiffs' code has been outputted

19  by Copilot in the past actually shows why that's not plausible

20  at all because they're saying, well, look, you can get it to

21  happen if you go to all these lengths, but it's not facially

22  plausible that somebody went to these lengths.

23      And that's what I have on the standing question.  There is

24  a related, sort of -- there is a related discussion regarding

25  1202 about the examples that, while we're on the examples, I

1  would address, unless Your Honor wants to talk about something

2  else first.

3      **THE COURT:**  You should give the argument you came to

4  make.  If I have a question or want to redirect somebody, I'll

5  speak up.

6      **MR. GRATZ:**  Very good.

7      Staying on the examples, with respect to the 1202 claim,

8  the examples, once again, make it worse but they make it worse

9  in a different way.  The 1202 claim is about not including CMI,

10  their names and license notices, but the problem is they gave

11  the code without the CMI, the first 20 lines with no CMI there.

12  Any CMI that would have been there isn't there, and then the

13  next part is provided, and they say, Well, that does haven't

14  any CMI, but that didn't have any CMI in the original either.

15  It seems like there wasn't any CMI in these examples to begin

16  with.

17      But to the extent somebody removed CMI in these examples,

18  like, it was them.  In other words, it's hard to blame us for

19  not including CMI when they didn't include the CMI in the

20  portion that they --

21      **THE COURT:**  I need a little help understanding that.

22  Their allegation is that when they put certain prompts into the

23  system, that the algorithm reached back into this GitHub

24  repository, found their stuff, and then used -- that's actually

25  not at all right.

1       Their allegation is that at some earlier point in time,

2   this AI absorbed everything that was in GitHub, and that at

3   that time, it had the CMI on it, and now they're giving it

4   these prompts and they're getting output, and I guess I'm

5   missing the part of your argument where somehow it's the

6   plaintiffs' fault that there is not CMI on there.  I'm just not

7   getting that.

8           **MR. GRATZ:**  So, right, and let me -- let me say it a

9   slightly different way, Your Honor, sort of -- to make it

10  concrete, it may work -- may work to look at page 28 of the

11  Complaint, but the --

12          **THE COURT:**  I will.

13          **MR. GRATZ:**  It is the -- the point is that they are

14  saying -- well, actually, let me wait until you have it before

15  Your Honor.

16          **THE COURT:**  You said page 28, not paragraph --

17          **MR. GRATZ:**  Page 28.

18          **THE COURT:**  I'm on page 28.

19          **MR. GRATZ:**  Great.  So at the bottom of page 28, the

20  transition from 28 to 29, we've got the pink part and then the

21  blue part.  Do you see that, Your Honor?

22          **THE COURT:**  I have a black-and-white printed copy

23  unfortunately, but that's okay.  You can keep going.  I'll look

24  it up later.

25          **MR. GRATZ:**  The transition from pink to blue happens

1    between numbered lines 1 and 2 in the -- in the line numbers.

2         **THE COURT:**  Yeah.

3         **MR. GRATZ:**  And the pink part, the part between line

4    15 of page 28 and about line 2 of page 29, that's what they put

5    in to Copilot.

6         **THE COURT:**  Yes.

7         **MR. GRATZ:**  As the prompt.

8         **THE COURT:**  Yes.

9         **MR. GRATZ:**  And that's a chunk of their code.  And

10   then --

11        **THE COURT:**  Right.

12        **MR. GRATZ:**  -- what comes out after that, the blue

13   part, lines 2 to 13 on page 29, is what Copilot says in

14   response.

15        **THE COURT:**  Right.

16        **MR. GRATZ:**  And they're saying, Well, there's no CMI

17   here in the blue part, lines 2 to 13.

18        **THE COURT:**  Right.

19        **MR. GRATZ:**  But there's no CMI either in the pink part

20   or in the original of the blue part, which they provide earlier

21   in the Complaint; that is, this isn't showing that we removed

22   CMI or gave out a copy of something that originally had CMI on

23   it because the original didn't have CMI on it.  And to the

24   extent they're saying, Well, look, there's really some -- like,

25   the CMI was somewhere else and it was appurtenant to this and

1    you really needed to include it if you were going to ever utter

2    these lines, they gave us the first 20 lines without including

3    it, so it's hard for us to see how it's an act of removal for

4    us to do the same.

5        Does that make more sense, Your Honor?

6            **THE COURT:**  I understand the -- I think I understand

7    the argument, if that's what you're asking me.

8            **MS. HURST:**  Mr. Gratz, maybe I could take over on the

9    identical --

10            **MR. GRATZ:**  Please.

11            **MS. HURST:**  -- portion.

12        Your Honor, the premise of the original Complaint was that

13    the allegation that there was a one percent exact match among

14    some portion of the training database meant that it was

15    plausible that plaintiffs' code would occasionally be the

16    subject of that exact match in such a material degree that the

17    Court found that that was sufficient for them to proceed to

18    seek injunctive relief.

19        Now, what has happened with the more is less of the First

20    Amended Complaint is that we have seen that these are not exact

21    matches.  In every example that they gave, they produced --

22    took many lines of their code to produce fewer lines of that

23    code, and it turned out to be non-identical.

24        So in paragraph 103, a functionally equivalent but not an

25    actual match.  In paragraph 112, an allegation that Copilot has

1    reproduced the algorithm, something that's not protected under

2    Section 102(b), in a modified format.  So, again,

3    non-identical.  And those were Does 2 and 1.

4         With respect to Doe 5, where the tests, Your Honor -- they

5    put in eight lines to get five non-identical lines at

6    paragraphs 115 and 16, another five lines to get four

7    non-identical lines, and then in paragraphs 122 to 128, 28

8    lines to get 20 non-identical lines.

9         So in addition to the implausibility that anyone would

10   ever use Copilot in this fashion, that is, they would have open

11   in front of them a giant chunk of code, put in half of it

12   trying to produce the other half rather than simply cutting and

13   pasting, we have an output that doesn't match that condition.

14   That allegation that they posited the first time around was

15   that some portion of the time their plaintiffs' code would

16   result in an exact match or a regurgitation by the model.

17        And the significance of that from Section 1202

18   perspective, Your Honor, is that non-identical copies are not

19   the copies of the work that meet the definition of the statute.

20   And it's important that that distinction be made because

21   otherwise Section 1202 becomes a substitute for -- for the

22   provisions of the Copyright Act in all -- in all infringement

23   cases, even those where substantial similarity is contested.

24        And -- and the significance of that -- well, there are

25   many imports to that, but one is that the remedies are

1    materially different, Your Honor.  And so under plaintiff's

2    theory, the 1202 becomes a substitute for a garden variety

3    infringement claim rather than what it was intended to be,

4    which was a new limited remedy that was designed to address the

5    threat of the internet and the possibility of mass copying or

6    mass piracy or mass counterfeiting that -- that was introduced

7    by virtue of the internet.

8         And, Your Honor, that's not the situation here.  So in

9    order to remedy that -- that problem, they now bring training

10   into the case, and they're alleging, you know, that Copilot is

11   a derivative work, and that has implications for preemption in

12   a moment which I'll also address.

13        But they're also trying to -- to -- to use training to

14   shore up this hole that they have, which is that they have not

15   been able to allege that the model is, in fact, capable of

16   regurgitating verbatim the plaintiffs' work, and, indeed, the

17   First Amended Complaint shows that it does not.

18        Your Honor, so these cases, these 1202 cases, strongly

19   suggest that that is not a situation in which the CMI claims

20   will apply because 1202 does not apply when -- when an

21   allegedly infringing work is simply based upon the underlying

22   work, and that is because that cannot meet the requirements of

23   the statute for removal in connection with copies that were

24   conveyed containing copyright management information.  And

25   that's 1202(b)(3).  And 1202(b)(1), Your Honor, requires

1    removal from the original.  There is no allegation here that

2    anybody went into GitHub repositories and stripped off license

3    information from their original commits or anything like that.

4    And so, Your Honor, this lack of identity is extremely

5    important from the perspective of the 1202 claims.

6         Going on to preemption briefly, Your Honor, plaintiffs

7    attempt to shore up their state law claims in the face of

8    preemption by arguing broadly that these claims are really

9    about use and they're not about reproduction suffers from the

10   problem that they are trying to avoid the limitations of the

11   Copyright Act.

12        The Copyright Act is a delicate balance.  It's not just

13   what rights are protected.  It's also how those rights are

14   limited, and those limitations are very significant.  For

15   example, Your Honor, Section 102(b), the idea versus expression

16   dichotomy; Section 107, fair use; and there are other obviously

17   codified limitations.

18        And what preemption does is the scope of preemption sweeps

19   broader than the protection under the act, and the reason that

20   the scope of preemption sweeps broader than the protection

21   under the act is to preserve those limitations and to not allow

22   plaintiffs to use state law claims strategically to evade those

23   limitations and to impose liability where the Copyright Act

24   would otherwise forbid liability.

25        And the only time that that is not true is when there is a

1    material extra element that qualitatively changes the nature of

2    the claims.  And that is simply not the case with respect to

3    these state law claims, Your Honor.  And saying "use" does not

4    take it out of the realm of reproduction when the use is, in

5    fact, accomplished by reproduction.

6         And to permit the plaintiffs to premise a claim on --

7    saying, Well, use is not covered by the act, it's not one of

8    the rights enumerated by Section 106 -- to permit them to

9    premise the claim on a use that's accomplished by reproduction,

10   which is an enumerated right, and thereby to avoid the

11   limitations of Section 102 and 106, both of which are very

12   important in this case -- code is thin copyright.  Idea versus

13   expression dichotomy and the lack of protection for the kind of

14   sequence that we see in the examples in the Complaint is

15   very -- going to be very significant in this case, as is fair

16   use.

17        And so in order for plaintiffs to be able to evade

18   preemption and evade those limitations by declaring that

19   they're really only attacking use instead of a misappropriation

20   of the subject matter of copyright, the Court should not permit

21   them to do that.

22        And it's clear with respect to their interference claims,

23   their negligence claim, their unjust enrichment claim that all

24   of those are actually targeting the -- the reproduction of this

25   material as part of both the training and the alleged outputs

1  of Copilot, Your Honor.  And nothing makes it more obvious than

2  their allegation that Copilot itself is a derivative work at

3  paragraph 194, note 34.  And their theories -- all of their

4  theories flow from the notion that Copilot is itself a

5  derivative work and that the outputs also are copies.  All of

6  their state law theories flow from that, Your Honor, and those

7  are preempted.

8          **THE COURT:**  Thank you, Ms. Hurst.

9      Ms. Lee, how much time do defendants have remaining?

10         **THE CLERK:**  Five minutes, Your Honor.

11         **THE COURT:**  Thank you, Ms. Lee.

12     Mr. Saveri.

13         **MR. SAVERI:**  Thank you, Your Honor.  The -- I don't

14 know if you want to handle any of your questions in particular

15 order.

16         **THE COURT:**  No.  I think -- I mean, I sort of -- I

17 don't have that many questions for the parties today.  I -- as

18 you heard me say to Mr. Gratz, I think you have an uphill

19 battle on preemption.  I thought Ms. Hurst's sentence did a

20 good job of encapsulating that problem when she said, "Relying

21 on the term 'use' does not take the claim out of the realm of

22 reproduction when the use you're talking about is

23 reproduction," and that's not a bad way of summarizing what I

24 think is going on with regard to preemption.

25         Otherwise, no, I don't have any comments or questions for

1    you.  You should make the argument you came to make.

2         **MR. BUTTERICK:**  Fair enough.  Thank you, Your Honor.

3    This is Matthew Butterick on behalf of the plaintiffs.

4         So I would just like to talk a little bit about the issue

5    with the code samples.  As I recall from our previous motion to

6    dismiss hearing and your order, there was a homework assignment

7    of sorts assigned to us which is -- I think the question arose,

8    but there haven't been any allegations of these particular

9    plaintiffs' code being output from Copilot, and I believe we

10   spoke at some length about this *Birdsong* case, if I remember,

11   about the hearing loss and the iPod.  So, you know, challenge

12   accepted.

13        We deliver, and it feels, to a certain extent, like the

14   argument that we're hearing today is the defendants having put

15   down the challenge and we having accepted it.  The goalposts

16   are now kind of being moved much further away and made much

17   smaller.

18        You know, here's what we have learned by providing these

19   samples.  Thing 1, we've been able to show that, you know, for

20   Does 1, 2 and 5, their code is, you know, definitely part of

21   the training dataset as we contended.

22        Step 2, we have been able to show that, you know, suitably

23   operated, Copilot can produce, you know, verbatim or near

24   verbatim copies.  And I think near verbatim remains important

25   because, again, this is not a copyright infringement case.  We

1   hear a lot about copyright and fair use, but this is

2   primarily -- I mean, this main claim we're speaking of is about

3   open source licenses, breach of open source license.

4       I think the right question is if you had made this code as

5   a human being, would you be obligated to follow the license

6   that had been attached to it?  Absolutely.  If you modify it a

7   little bit?  Absolutely.

8       Because here's the other thing that --

9       **THE COURT:**  Mr. Butterick, I know the court reporter

10   would like me to ask you to slow down.

11      **MR. BUTTERICK:**  All right.  Fair enough.  Thank you.

12      So -- and the third point that we can -- we can now -- we

13   have now figured out is that we know that in the code samples,

14   the only place that Copilot could have gotten the code is from

15   our plaintiffs because, you know -- and we have invited the

16   defendants to search GitHub.  There is no other location where,

17   you know, these particular code samples exist.  They are

18   distinctive.

19      So, you know, I think these three things taken together,

20   you know, show that there is a capability that Copilot has to

21   output the code.

22      And to go to this argument that, well, but the fact that

23   they did it, you know, as part of the Amended Complaint, that

24   doesn't confer standing.  We're not saying, clearly, that these

25   examples are the injury that produces standing.  We're saying

that this demonstration of capability raises a plausible

inference based on the many people who use Copilot and the many

prompts that have been put in that -- the plausible inference

that our plaintiffs' code has, in fact, been admitted in the

past, and we -- you know, we say that repeatedly.

And, again, I just want to emphasize that the fact that

the code comes out in a slightly modified version, that doesn't

change anything from the standpoint of open source license

compliance.

So that's all I think I have to say about that right now,

unless you have questions, Your Honor.

**THE COURT:**  I don't.  Thank you.

**MR. BUTTERICK:**  All right.

As to the issue of the -- the DMCA and the identicality, I

think we've covered that in our -- in our opposition very

clearly.  I mean, I think the part that's being overlooked here

is that our plaintiffs and every open source programmer is

deliberately, you know, putting their code under these open

source licenses, and, indeed, our class is limited to people

who have, in fact, done so.

So we know that all the code in this case was under one of

these, as we call them in the Complaint, the suggested

licenses, all of which require attribution when you use the

code.

As we -- and when you use -- again, if you were a human

programmer using this code that is subject to an open source

license, again, as we were saying before, the moment you do so,

you incur the obligations under the license.

And when the license has a provision that says you must

provide attribution and a copy of the license, that is, right,

a CMI obligation that is being incurred.

We cite cases in our opposition that support this.  The

*Neo4j* case -- this is on page 14 of our opposition -- that held

that removal of an open source license does constitute a

Section 1202(b) violation.  And, again, the court did not find

it salient that the -- as we were hearing before, but the CMI

wasn't in the actual code.  Well, that's not how these open

source projects are arranged.  The license is usually in a

separate file at the top level of the repository.  That's not

only where it is by convention; that's where GitHub itself

recommends that you store the license, and that's, in fact,

where our plaintiffs did so.

And then the second part of it is this question of

identicality.  Again, page 14 of our opposition, we've got this

*ICONICS* case which held that there is no requirement that

the -- that the copy from which the CMI is removed be

identical.

So I think in the end, you know, what this amounts to is

that if you put in some -- a prompt to Copilot and you get out

code that, again, if you had been -- you know, a human coder

1   would have incurred these obligations under an open source

2   license; right?  You would have had to stick that upstream

3   license on your code.  And Copilot certainly doesn't do that.

4   Copilot certainly doesn't show you anything about where that

5   code comes from.  So I think that's a summary on that.

6        Are there any questions, Your Honor?

7        **THE COURT:**  No, there aren't.  Thank you,

8   Mr. Butterick.

9        **MR. BUTTERICK:**  I will turn it over to Mr. Saveri.

10        **MR. SAVERI:**  So with that, Your Honor, I guess I'll

11   address the preemption point which Ms. Hurst covered.

12        And I guess what I would say is that the -- the

13   requirement or the case law that has been developed says quite

14   clearly that state tort law claims concerning unauthorized use

15   are not preempted by the Copyright Act if the additional claims

16   include additional elements.

17        Now, they may derive from the same conduct.  They may

18   involve the unauthorized use, but if the state law claims, as

19   the Ninth Circuit says, include an additional element, those

20   claims are not going to be preempted.

21        And each one of the state law claims that we assert

22   include additional elements.  That's true for our Counts 4 and

23   5 which assert claims for interference with economic relations,

24   both under an intentional and a negligent claim.  That's also

25   true with respect to the unfair competition claim, which

1    includes three separate prongs:  One is unfair, one is

2    unlawful, and one is fraudulent.  Each one of those prongs

3    includes elements which are in addition to the Copyright Act.

4         The same can be said for the unjust enrichment claim which

5    is in the nature of a quasi contract claim which derives from

6    the -- the benefit of -- the inequitable benefit that is

7    derived from the conduct of defendants.  Those are not any --

8    any of those elements which I discussed are not elements of

9    the -- of the -- of the Copyright Act claim or the -- the DMCA.

10        The same can be said with respect -- for the negligence

11   claim which involves the basic, you know, ideas about a duty

12   which derives from the -- the control of --

13        **THE COURT:**  Let's take your -- let's take your

14   interference -- I beg your pardon.  Let's take your intentional

15   and negligent interference with prospective economic relations

16   claims.  These are the ones you were just talking about.

17        **MR. SAVERI:**  Yes.

18        **THE COURT:**  You had started to go on to something else

19   for a second, and it took me a minute to find my notes.  So,

20   anyway, here's my question.

21        Isn't the core of those claims that plaintiffs have a

22   tort-based exclusive right to control the reproduction and

23   distribution of certain code to the general public?

24        **MR. SAVERI:**  I'm sorry.  Did you say "tort-based,"

25   Your Honor?

1        **THE COURT:**  I did say that.  Isn't the core of those

2 claims that plaintiffs have a tort-based exclusive right to

3 control the reproduction and distribution of certain code to

4 the general public?

5        **MR. SAVERI:**  Well, Your Honor, there are obligations

6 in the open source licenses that are unique.  We cite cases for

7 the proposition that say that the -- the economic rights, the

8 property rights that are created by open source licenses are

9 different.  Those include things like reputational harm or the

10 reputation --

11        **THE COURT:**  Reputational harm wouldn't attach to one

12 of these prospective -- I was about to use the word "contract."

13 The rights do sound a little bit in contract -- sorry, Pam,

14 I'll slow down.

15     Reputational rights don't attach to a prospective economic

16 relations claim, do they?  You damaged my reputation.  Isn't

17 that something else?

18        **MR. SAVERI:**  Well, Your Honor, I -- I think if that

19 kind of harm is foreseeable, that is the kind of damage that

20 is -- for which you can seek redress under a -- a negligence or

21 intentional interference claim.

22     So we also cite, I think, the *Pitchford* case for that

23 proposition.  That's a case where the court held that there was

24 no preemption where defendants failed to comply with the terms

25 of an open source license.  So that -- that's the idea.

1   Now, certainly there is overlap in the theories.  The same

2   set of facts give rise to multiple claims under different

3   theories, but with respect to the specific issue about

4   preemption, I mean, the fact that there are these additional

5   elements and there are additional types of remedies are the

6   kinds of things specifically that provide or show that these

7   are not preempted by the copyright law.  The copyright law

8   imposes none of these open source obligations that I just

9   talked about.  They're different.  We cite the *Versata Software*

10  case for that proposition.

11      So those -- I guess in brief -- I don't know where we are

12  on time, Your Honor, but I wanted to address --

13          **THE COURT:**  Ms. Lee, how much time do plaintiffs have?

14          **THE CLERK:**  Eleven minutes, Your Honor.

15          **THE COURT:**  All right.

16      **MR. SAVERI:**  So, Your Honor, I guess with that,

17  I'll -- I'll stop unless there are more specific -- or

18  additional specific questions or concerns you want to -- to

19  direct us to.

20          **THE COURT:**  I don't have any.  Thanks.  I'll reread

21  *Pitchford*.

22      And the reason, by the way -- the reason Mr. Gratz liked

23  that sentence so much in the question I asked you is that he or

24  a member of his firm wrote the sentence.  It's a sentence that

25  I took from their opening brief.  Anyway --

1      **MR. SAVERI:**  I -- I understood, Your Honor, and I

2   wanted to -- I didn't need to give Mr. Gratz any more deference

3   with respect to the language that the Court read back to me,

4   but I do appreciate the provenance of it.

5      So the only other thing I guess I would add, Your Honor,

6   is that with respect to the -- the code snippets or the code

7   that we had produced, you know, the Court -- the call of the

8   question after the last hearing was whether plaintiffs could

9   show that -- not that the injury had been suffered by others

10   but by them.

11      Our -- our allegations or our inclusion of these

12   additional examples show that the -- the -- that the particular

13   plaintiffs that we've identified have, in fact, had their --

14   their code copied.  It's in the -- it's in the database.  It --

15   it can be generated and -- without -- without particular

16   difficulty.

17      I mean, the fact that the code that we used to elicit that

18   response takes the form that it does is, in fact, the --

19   derived from the fact that Copilot is a code completion tool

20   and that when -- I mean, the whole point of the exercise is for

21   coders to provide certain types of code, and then presented

22   with that, how does the program operate to complete that.  And

23   this shows that the software does that by producing the code of

24   our plaintiffs.  And that's -- that's -- the program does what

25   it is intended to do, and in that way, produces the copies of

1    our plaintiffs' code.

2         I'll stop right there.

3              **THE COURT:**  Thanks, Mr. Saveri.

4         Mr. Gratz or Ms. Hurst.

5              **MR. GRATZ:**  On the examples just briefly, I want to

6    start where Mr. Saveri left off.

7         That the -- that their code was collected and used is what

8    they alleged last time, and I agree with Mr. Saveri that

9    Copilot is a code completion tool.  Wouldn't it be compelling

10   to provide some other code that wasn't the first half of the

11   plaintiffs' code that you would need to have accessed the

12   plaintiffs' code and already have a copy of it and then show

13   that, well, in light of that other code, Copilot outputs the

14   plaintiffs' code.  That is not -- that would be a very

15   different story --

16              **THE COURT:**  Well, it might be different, but why are

17   the plaintiffs required to prove -- to use a harder case?

18              **MR. GRATZ:**  Because this --

19              **THE COURT:**  I mean, this is pass/fail.  They don't

20   need to get an A.

21              **MR. GRATZ:**  So I agree, Your Honor, but this is a fail

22   because it's not plausible that anybody would put in the first

23   half of their exact code, and they haven't said why it would

24   be.  And I think the -- the example, for example, in paragraph

25   116 is good on this.  It just -- it's -- it's not plausible

1    that you'd put in the first three-quarters in order to get

2    more.  If you've got the first three-quarters, you've already

3    got the rest.

4         To the extent they are using this to try --

5         **THE COURT:**  Aren't you -- aren't you framing the

6    question -- well, I'll just say, you're framing the question --

7    unsurprisingly, you're framing the question the way that's

8    helpful to you.  That's not the only way of looking at it.

9         One way of looking at the probabilities is to say if five

10   times people put in the beginning of something that already

11   exists and every single time Copilot spits out the second

12   half -- and I understand we're having a quarrel about whether

13   it is the second half and whether the copy's exact and all

14   that, but I don't want to talk about that right now.

15        If in all five times Copilot spits out the second half,

16   the question I'm asking is, is it implausible to allege that

17   the reason that happened was copying?  And I don't ever really

18   get to your point.  I mean, I get to your point in the sense of

19   I have to think about it, but I don't know that I hang my

20   analytical hook on the question, Well, but did they have to use

21   exactly the first half.  That's not where the party is for me.

22        **MR. GRATZ:**  Well, where the party is, Your Honor, we

23   think, after the last round of this, is did that happen?  Like,

24   what is the reason to think that, setting aside the future,

25   which is -- which is one thing, is there a reason to think that

1   this thing happened in the past?

2       They already -- they alleged last time, you know, sooner

3   or later our stuff is going to come out; right?  But -- but

4   what -- what they didn't do was plausibly allege that their

5   stuff had to come out.

6           **THE COURT:**  Mr. Gratz, you have two minutes, by the

7   way.

8           **MR. GRATZ:**  Let me pause and pass to Ms. Hurst.

9           **THE COURT:**  Very good.

10      Ms. Hurst.

11          **MS. HURST:**  Your Honor, I think the Court has

12  preemption exactly right.  If you look at Counts 4 and 5, for

13  example, they -- the gravamen of the harm are words like

14  "emitting code" or "scraping" or "copying" in paragraphs 250,

15  257, 261.  The gravamen of all of those claims is exactly as

16  the Court put it, the right to control the reproduction and

17  distribution of code to the public.

18      Your Honor, the *ICONICS* case and the other -- the other

19  cases that we've cited, they come to a different result.  The

20  better result is that it must be identical, and the reason for

21  that is the proper interpretation of the statutory language and

22  also the statutory purposes that 1202 is not intended to create

23  an entirely new set of remedies in every copyright infringement

24  case where there was CMI -- where somebody put a copyright

25  notice on the original, which would be the import of

plaintiffs' proposal.

Your Honor, on this last point, the reason why the examples gave us the situation where more is less, I don't think anybody's disputing, for purposes of a motion to dismiss, that plaintiffs' code was, in fact, used to train the models. What the Court aptly observed in the first hearing on the first motion to dismiss that it was very hard to see how they would make any credible claim that training would cause them a damages or monetary-based injury.  And that is true today as it was then.

So do the examples get us over the hump on showing that outputs happened in the past where, for purposes of discussion, we're equating those outputs having occurred with a reasonable claim to actual injury for monetary purposes, just putting aside whatever disputes there might be about that.

Your Honor --

**THE COURT:**  Thank you, Ms. Hurst.  Your time has elapsed.

**MS. HURST:**  Okay.  Thank you, Your Honor.

**THE COURT:**  Thank you all very much.

Mr. Saveri -- actually, not thank you all very much quite yet.

Mr. Saveri, you have, I think, lots of time for rebuttal argument if you want it.

Ms. Lee, how much time does Mr. Saveri have?

1      **THE CLERK:**  Eight minutes and eight seconds,

2  Your Honor.

3      **THE COURT:**  Very good.

4    Mr. Saveri, Mr. Butterick.

5      **MR. BUTTERICK:**  Yes, Your Honor.  I just wanted to

6  make a couple quick points, and I'll turn it back to

7  Mr. Saveri.

8      Something I wanted to mention before, I appreciated what

9  you were saying about it's pass/fail not -- not on the curve.

10  And, you know, as we mentioned in paragraph 128, we have been

11  able to generate these output examples despite being at a

12  significant evidentiary advantage that -- excuse me --

13  disadvantage at this point in the case because we don't have

14  access to the telemetry data and the training data and so

15  forth.  We have gone and used Copilot as we founded.  We don't

16  know exactly when the training occurred.  We've had to sort of

17  figure out all of this by trial and error, and despite those

18  disadvantages, we have been able to do it.

19    So, you know, we remain confident that as we get into

20  discovery and get more information, we'll be able to do any --

21  excuse me -- better.

22    I want to mention in paragraph 134, as far as the issue of

23  these small cosmetic variations, that we contend that this is a

24  deliberate feature of GitHub in the sense that it allows them

25  to output more code under licenses without having it be

1     detected by any kind of verbatim filter.

2          And, lastly, I just wanted to mention, you had a question

3     about whether negligent interference is a reputational harm,

4     and I would say yes, it is.  I mean, we do describe it as a

5     reputational harm in paragraph 264.  But I think that idea is

6     also inherent in this whole case of why attribution is such an

7     important concept in open source licenses; that *Jacobsen vs.*

8     *Katzer* case that upheld that those are values, too, above and

9     beyond, and they do preempt copyright, and they are important

10    in their own right.

11         So that was all I had to say.

12              **THE COURT:**  Thank you.

13              **MR. SAVERI:**  Your Honor, one final point.

14         Ms. Hurst talked about the gravamen of the claim being --

15    in this case being all the same for all the causes of action.

16    Well, the fact that that's true doesn't really address the

17    preemption analysis.

18         The preemption analysis specifically asks whether --

19    regardless of whether there's a single gravamen of the claims,

20    whether there are additional elements to the state law claims.

21    And as we've been arguing and as we've showed, the state law

22    claims that we bring contain additional elements, regardless or

23    even though there's substantial factual overlap between the

24    factual predicate of each of the claims that we assert in the

25    Complaint.

1          **THE COURT:**  Thanks, Mr. Saveri.

2          **MR. SAVERI:**  You're welcome, Your Honor.

3          **THE COURT:**  All right.  Thank you all.  These motions

4   are now under submission.

5                (Proceedings adjourned at 2:52 p.m.)

1

2

3                         CERTIFICATE OF REPORTER

4          I certify that the foregoing is a correct transcript

5     from the record of proceedings in the above-entitled matter.

6

7     DATE:   Friday, November 17, 2023

8

9     *Pamela Batalo Hebel*

10    _____
      Pamela Batalo Hebel, CSR No. 3593, RMR, FCRR
11    U.S. Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25