1  Joseph R. Saveri (State Bar No. 130064)
2  Cadio Zirpoli (State Bar No. 179108)
   Christopher K.L. Young (State Bar No. 318371)
3  Louis A. Kessler (State Bar No. 243703)
   Elissa A. Buchanan (State Bar No. 249996)
4  William W. Castillo Guardado (State Bar No. 294159)
   Holden J. Benon (State Bar No. 325847)
5  **JOSEPH SAVERI LAW FIRM, LLP**
6  601 California Street, Suite 1000
   San Francisco, CA 94108
7  Telephone:    (415) 500-6800
8  Facsimile:    (415) 395-9940
   Email:        jsaveri@saverilawfirm.com
9                czirpoli@saverilawfirm.com
                 cyoung@saverilawfirm.com
10               lkessler@saverilawfirm.com
11               eabuchanan@saverilawfirm.com
                 wcastillo@saverilawfirm.com
12               hbenon@saverilawfirm.com

13 *Counsel for Individual and Representative*
14 *Plaintiffs and the Proposed Class*

15 [Additional Counsel Listed on Signature Page]

16                **UNITED STATES DISTRICT COURT**
17               **NORTHERN DISTRICT OF CALIFORNIA**
                        **OAKLAND DIVISION**
18

19 J. DOE 1 et al.,                          Case Nos.   4:22-cv-06823-JST
                                                          4:22-cv-07074-JST
20     *Individual and Representative Plaintiffs,*

21         v.                                **PLAINTIFFS' OPPOSITION TO**
                                             **OPENAI'S MOTION TO DISMISS THE**
22 GITHUB, INC., et al.,                     **SECOND AMENDED COMPLAINT**

23                          *Defendants.*    Date:       May 16, 2024
                                             Time:       2:00 p.m.
24                                           Courtroom:  6, 2nd Floor
                                             Judge:      Hon. Jon Tigar
25

26

27

28

# TABLE OF CONTENTS

I.   INTRODUCTION ................................................................................................ 1

II.  PROCEDURAL HISTORY .................................................................................. 1

    A.   Plaintiffs' Initial Complaint (ECF No. 1) ................................................. 1

    B.   The Court's Order on OpenAI's Motion to Dismiss the Initial Complaint
        (ECF No. 95) ............................................................................................. 2

    C.   Plaintiffs' First Amended Complaint (ECF No. 97) ................................. 2

    D.   The Court's Order on OpenAI's Motion to Dismiss First Amended Complaint
        (ECF No. 189) ........................................................................................... 3

    E.   Plaintiffs' SAC (ECF No. 200) and Its New Allegations ........................ 3

III. ARGUMENT ....................................................................................................... 3

    A.   Plaintiffs' Second Amended Complaint Plausibly Alleges DMCA Violations
        under DMCA §§ 1202(b)(1) and 1202(b)(3) ........................................... 3

        1.   Plaintiffs' DMCA claims are plausibly alleged under any standard............ 5

            a.   Identicality is not an element of a DMCA § 1202 claim ................ 6

            b.   Plaintiffs allege that Copilot reproduces identical copies of
                Plaintiffs' code ...................................................................................10

        2.   The DMCA does not require an entire work to be copied........................ 12

    B.   Plaintiffs Adequately Allege Breach of Contract by OpenAI Through Its Mass
        Violation of Open-Source Licenses.......................................................... 13

        1.   OpenAI's failure to raise these arguments before forecloses OpenAI's
            Rule 12 motion under Rule 12(g)(2) ...................................................... 13

        2.   Plaintiffs adequately allege breach of contract based on the operation of
            OpenAI's Codex product and its integration into GitHub and OpenAI's
            joint venture, the Copilot product ........................................................... 15

        3.   OpenAI's failure to abide by open-source licenses adequately supports a
            breach-of-contract claim ........................................................................ 17

            a.   Plaintiffs sufficiently plead breach of contract because the
                attribution and notice requirements of OSLs are properly
                considered covenants and not conditions ......................................18

a. Jacobsen v. Katzer is not determinative ........................................ 20

b. Plaintiffs' allegations of OSL violations include "copyleft" requirements that OpenAI completely fails to address ................ 24

IV. CONCLUSION ........................................................................................ 25

1

## TABLE OF AUTHORITIES

2

**Cases**

3

*ADR Int'l Ltd. v. Inst. for Supply Mgmt. Inc.*,
   667 F. Supp. 3d 411 (S.D. Tex. 2023) ..................................................... 6, 7, 8

4

5

*In re Apple iPhone Antitrust Litig.*,
   846 F.3d 313 (9th Cir. 2017) .................................................................. 13

6

*Artifex Software, Inc. v. Hancom, Inc.*,
   No. 16-CV-06982-JSC, 2017 WL 1477373 (N.D. Cal. Apr. 25, 2017) ...................... 17, 24, 25

7

8

*Burroughs v. Metro–Goldwyn–Mayer, Inc.*,
   683 F.2d 610 (2d Cir. 1982) ................................................................... 12

9

10

*Call v. Alcan Pac. Co.*,
   251 Cal.App.2d 442 (1967) ..................................................................... 19

11

12

*Columbia Pictures Indus., Inc. v. Galindo*,
   No. 20-cv-3129-MEMF, 2022 WL 17094713 (C.D. Cal. Nov. 18, 2022) ....................... 6

13

*Doe 1 v. GitHub, Inc.*,
   672 F. Supp. 3d 837 (N.D. Cal. 2023) ..................................................... 2, 5, 13, 17

14

15

*Fischer v. Forrest*,
   286 F. Supp. 3d 590 (S.D.N.Y. 2018) ......................................................... 7, 8

16

17

*Forest v. Equitable Life Assurance Soc'y of U.S.*,
   No. C99-5173 SI, 2001 WL 1338809 (N.D. Cal. June 12, 2001) ............................... 16

18

*Friedman v. Live Nation Merch., Inc.*,
   833 F.3d 1180 (9th Cir. 2016) .................................................................. 8

19

20

*Frost-Tsuji Architects v. Highway Inn, Inc.*,
   No. CIV 13-00496 SOM, 2015 WL 263556 (D. Haw. Jan. 21, 2015) .......................... 7

21

22

*Harrell v. City of Gilroy*,
   No. 17-CV-05204-LHK, 2019 WL 452039 (N.D. Cal. Feb. 5, 2019) ....................... 14

23

24

*Harrington v. Pinterest, Inc.*,
   No. 5:20-CV-05290-EJD, 2022 WL 4348460 (N.D. Cal. Sept. 19, 2022) ................... 4

25

26

*Horgan v. Macmillan, Inc.*,
   789 F.2d 157 (2d Cir. 1986) .................................................................. 12

27

28

*Jacobsen v. Katzer*,
   535 F.3d 1373 (Fed. Cir. 2008) ........................................................... *passim*

*Kelly v. Arriba Soft Corp.*,
   77 F. Supp. 2d 1116 (C.D. Cal. 1999) ............................................................. 7

*Kirk Kara Corp. v. W. Stone & Metal Corp.*,
   No. CV 20-1931-DMG (EX), 2020 WL 5991503 (C.D. Cal. Aug. 14, 2020) ................... 3, 7, 8

*Laborers Health Welf. Tr. Fund v. Kaufman & Broad of N. Cal., Inc.*,
   707 F.2d 412 (9th Cir. 1983) ............................................................. 20

*Logan v. Meta Platforms, Inc.*,
   636 F. Supp. 3d 1052, 2022 WL 14813836 (N.D. Cal. Oct. 25, 2022) ...................... 4

*Mario V. v. Armenta*,
   No. 18-cv-00041-BLF, 2019 WL 81337140 (N.D. Cal. Apr. 17, 2019) ..................... 14

*MDY Indus., LLC v. Blizzard Ent., Inc.*,
   629 F.3d 928 (9th Cir. 2010) ............................................................. 18

*Mollman v. Zoetop Bus. Co.*,
   No. CV 22–4128 (PA), 2022 WL 17207103 (C.D. Cal. Sept. 16, 2022) ..................... 4

*Murphy v. Millennium Radio Grp. LLC*,
   650 F.3d 295 (3d Cir. 2011) ............................................................. 8

*Myrick v. Mastagni*,
   185 Cal. App. 4th 1082 (2010) ............................................................. 16

*Netbula, LLC v. Storage Tech. Corp.*,
   No. C06-07391 MJJ, 2008 WL 228036 (N.D. Cal. Jan. 18, 2008)....................... 19, 24

*Oracle Int'l Corp. v. Rimini St., Inc.*,
   No. 2:14-cv-01699-MMD-DJA, 2023 WL 4706127 (D. Nev. July 24, 2023) ............... 9, 11, 12

*Pac. Allied v. Century Steel Prods.*,
   162 Cal. App. 2d 70, 327 P.2d 547 (1958) ............................................... 19

*In re Packaged Seafood Prods. Antitrust Litig.*,
   277 F. Supp. 3d 1167 (S.D. Cal. 2017) ............................................... 14, 15

*ProCD, Inc. v. Zeidenberg*,
   86 F.3d 1447 (7th Cir. 1996)....................................................... 21, 22

*Shaw v. Lindheim*,
   919 F.2d 1353 (9th Cir. 1990) ............................................................. 12

*Software Freedom Conservancy, Inc. v. Vizio, Inc.*,
   No. 8:21-cv-01943-JLS-KES, 2022 WL 1527518 (C.D. Cal. May 13, 2022) ............... 17, 22, 25

*Software Pricing Partners, LLC v. Geisman*,
   No. 3:19-cv-00195-RJC-DCK, 2022 WL 3971292 (W.D.N.C. Aug. 31, 2022) .........................9

*Splunk Inc. v. Cribl, Inc.*,
   662 F. Supp. 3d 1029 (N.D. Cal. 2023) ...................................................................................9

*Stevens v. Corelogic, Inc.*,
   899 F.3d 666 (9th Cir. 2018) ...................................................................................................3

*Textile Secrets Int'l, Inc. v. Ya-Ya Brand Inc.*,
   524 F. Supp. 2d 1184 (C.D. Cal. 2007) ....................................................................................6

*Ticketmaster L.L.C. v. Prestige Ent., Inc.*,
   306 F. Supp. 3d 1164 (C.D. Cal. 2018) ..........................................................................*passim*

*Versata Software, Inc. v. Ameriprise Fin., Inc.*,
   No. A-14-CA-12-SS, 2014 WL 950065 (W.D. Tex. Mar. 11, 2014) ....................................25

*Widespread Elec. Sales, LLC v. Upstate Breaker Wholesale Supply, Inc.*,
   No. 3:20-CV-2541-K, 2023 WL 8721435 (N.D. Tex. Dec. 17, 2023) .....................................8

**Statutes**

17 U.S.C. § 101 ............................................................................................................*passim*

17 U.S.C. § 106 .....................................................................................................................4, 7

17 U.S.C. § 1202 ...........................................................................................................*passim*

**Rules**

Fed. R. Civ P. 7 ........................................................................................................................14

Fed. R. Civ P. 12 .................................................................................................13, 14, 15, 20

**Treatises**

1 Witkin, Summary of Cal. Law, Contracts § 801 (2023) ....................................................19

Restatement (Second) of Contracts § 2 (1981) .....................................................................21

13 Williston on Contracts § 38:15 ..........................................................................................19

**Other Authorities**

S. Rep. No. 105-190 (1998) ...........................................................................................6, 7, 9

## I.  INTRODUCTION

This case involves the fundamental right of software creators who license their code pursuant to open-source licenses to have their rights protected under the law. The OpenAI defendants ("OpenAI"), which knew the code was subject to these open-source licenses, copied software creators' code to create an artificial intelligence product, Codex, that has the power to reproduce the very code on which it was trained. OpenAI could have followed the law: it could have licensed this code (as it has sought to do with others); it could have also ensured that any copies, modifications, and derivatives of this code adhered to the terms of the open-source licenses under which the original code was created. Instead, OpenAI acted with impunity.

OpenAI seeks to dismiss claims in Plaintiffs' Second Amended Complaint ("SAC") for violations of the Digital Millennium Copyright Act ("DMCA") and breach of contract arising from violation of the terms of the open-source licenses ("OSLs") that were attached to code and other materials (aka "Licensed Materials") belonging to Plaintiffs. OpenAI's motion under DMCA should be rejected for the same reasons the Court should reject GitHub and Microsoft's motion to dismiss Plaintiffs' DMCA claims. OpenAI's attempt to dismiss the Plaintiffs' breach of contract claim fares no better. Plaintiffs allege that the Licenses they published code subject to are valid as enforceable contracts, despite OpenAI's arguments to the contrary.

## II.  PROCEDURAL HISTORY

### A.  Plaintiffs' Initial Complaint (ECF No. 1)

On November 21, 2022, Plaintiffs Doe 1, Doe 2, Doe 3, and Doe 4 filed their initial complaint in this matter alleging, that OpenAI (and other defendants) violated DMCA §§ 1202(b)(1) and (b)(3) by removing or altering Copyright Management Information ("CMI") from Plaintiffs' Licensed Materials and distributing copies of those Materials that did not include CMI. ECF No. 1 ¶¶ 138–67. Plaintiffs also brought a claim for Breach of Contract—Open-Source License Violations. *Id.* ¶¶ 168–83.

**B.     The Court's Order on OpenAI's Motion to Dismiss the Initial Complaint (ECF No. 95)**

On January 26, 2023, OpenAI filed its motion to dismiss. ECF No. 53. OpenAI argued that Plaintiffs failed to state a claim for breach of contract (ECF No. 53 at 13–14) and failed to state a claim for violation of the DMCA. ECF No. 53 at 9–13.

On May 11, 2023, the Court issued its Order. The Court upheld the sufficiency of Plaintiffs' allegations for breach of contract and their claims under DMCA §§ 1202(b)(1) and 1202(b)(3). ECF No.95 (cited herein as *Doe 1 v. GitHub, Inc.*, 672 F. Supp. 3d 837, 859 (N.D. Cal. 2023) or "First MTD Order"). The Court also upheld the sufficiency of Plaintiffs' breach of open-source license pleadings. *Id.* at 860.

**C.     Plaintiffs' First Amended Complaint (ECF No. 97)**

On June 8, 2023, Plaintiffs filed their First Amended Complaint. ECF No. 97. Plaintiffs maintained their claims for violations of DMCA §§ 1202(b)(1) and (b)(3), *id.* at ¶¶ 183–213, and Breach of the OSLs. *Id.* at ¶¶ 214–29.

Plaintiffs' FAC also alleged new facts establishing Plaintiffs suffered particularized harm by specifying how Codex and Copilot output code that matches their licensed code that appears in GitHub public repositories, yet without providing the required attribution and notice and in violation of other terms of their licenses. Specifically, Plaintiffs provided examples of Copilot emitting Plaintiffs' code verbatim as output with only cosmetic changes. *E.g.*, *id.* at ¶¶ 100–28. The sample outputs are sufficiently distinctive to prove Copilot could have only taken the underlying code for these outputs from Plaintiffs' GitHub repositories. *E.g.*, *id.* at ¶¶ 103, 110, 119. As the FAC alleged, these examples illustrate the typical behavior of Copilot and raise a plausible inference that Plaintiffs' code has also been output in the past. *Id.* at ¶ 97.

OpenAI filed its motion to dismiss the FAC on June 29, 2023. ECF No. 110. OpenAI did not attempt to dismiss Plaintiffs' breach-of-contract claims based on the OSLs. As to the DMCA claim, OpenAI argued that Plaintiffs had failed to allege CMI removal from identical copies. ECF No. 110 at 12–13.

### D. The Court's Order on OpenAI's Motion to Dismiss First Amended Complaint (ECF No. 189)

On January 3, 2024, the Court issued its order on the motion to dismiss the FAC. ECF No. 189 (hereinafter "Second MTD Order"). The Court dismissed Plaintiffs' claims under DMCA §§ 1202(b)(1) and (b)(3), holding that the pleadings were insufficient because output from Copilot is often a modification of Plaintiffs' licensed works, as opposed to an "identical copy." *Id*. at 15. Though the Court recognized that DMCA § 1202(b)(1) only requires intentionally removing or altering any copyright recognized information without the authority of the copyright owner, and is distinct from § 1202(b)(3), which makes it illegal to "distribute, [or] import for distribution . . . copies of works," the court applied an "identicality" requirement to both DMCA §§ 1202(b)(1) and (b)(3). *Id*. at 15. The Court cited *Kirk Kara Corp. v. W. Stone & Metal Corp.,* No. CV 20-1931-DMG (EX), 2020 WL 5991503, at *6 (C.D. Cal. Aug. 14, 2020), a case that involved jewelry designs where the CMI was engraved in the copyrighted work. ECF No. 189 at 15. The Court still granted Plaintiffs leave to amend their DMCA §§ 1202(b)(1) and (b)(3) claims.

### E. Plaintiffs' SAC (ECF No. 200) and Its New Allegations

On January 25, 2024, Plaintiffs filed their Second Amended Complaint. ECF No. 200. Consistent with the Second MTD Order, the SAC included new allegations regarding the increased likelihood that Plaintiffs' or class members' licensed code would be emitted verbatim as the capacity and scope of the Copilot and Codex model grows. *Id*. at ¶¶ 104–07.

## III. ARGUMENT

### A. Plaintiffs' Second Amended Complaint Plausibly Alleges DMCA Violations under DMCA §§ 1202(b)(1) and 1202(b)(3)

The DMCA restricts "the removal or alteration of copyright management information ("CMI")—information such as the title, the author, the copyright owner, the terms and conditions for use of the work, and other identifying information set forth in a copyright notice or conveyed in connection with the work." *Stevens v. Corelogic, Inc.*, 899 F.3d 666, 671 (9th Cir. 2018). Sections 1202(b)(1) and (b)(3) of the DMCA, under which Plaintiffs plead, provide that

one cannot, without authority of the copyright owner, "(1) "intentionally remove or alter any copyright management information," *or* (3) "distribute or import for distribution . . . copies of works . . . knowing that copyright management information has been removed or altered" while "knowing, or . . . having reasonable grounds to know, that it will induce, enable, facilitate, or conceal an infringement of *any right under this title*." 17 U.S.C. § 1202(b) (emphasis added). Rights under Title 17, which encompasses the Copyright Act and DMCA, are not limited to the exclusive right of copyright holders to make copies of their works under § 106(1), but also include the exclusive right to make derivative works under § 106(2), and to distribute copies under § 106(3). *See* 17 U.S.C. § 106. Further, the Copyright Act's definition of "copies" does not require "identicality." 17 U.S.C. § 101.

"The pleading burden under the DMCA is low." *See Mollman v. Zoetop Bus. Co.*, No. CV 22–4128 (PA) (GJSx), 2022 WL 17207103, at *3 (C.D. Cal. Sept. 16, 2022). Moreover, while § 1202(b) claims require a plaintiff to plead scienter, such knowledge may be alleged generally and can be inferred through circumstantial evidence of intent. *See, e.g.*, *Logan v. Meta Platforms, Inc.*, 636 F. Supp. 3d 1052, 1063–64, 2022 WL 14813836, at *9 (N.D. Cal. Oct. 25, 2022) ("'[I]ntent, knowledge, and other conditions of a person's mind may be alleged generally'" for purposes of pleading DMCA § 1202(b)'s mental state requirements") (citations omitted).

A violation of § 1202(b)(1) is distinct from a violation of § 1202(b)(3) because it does not require the "distribution" or "import for distribution" of "copies of works" for liability. "To plead a violation of Section 1202(b)(1), a plaintiff must allege intentional removal of CMI." *Harrington v. Pinterest, Inc.*, No. 5:20-CV-05290-EJD, 2022 WL 4348460, at *4 (N.D. Cal. Sept. 19, 2022). The DMCA makes the mere removal of CMI from digital copies illegal before distribution of copies. To the extent an identicality requirement can be read into § 1202(b)(1), it should focus on how the copy was made and CMI removed—i.e., whether it was digital copying and removal of CMI. Plaintiffs have alleged that OpenAI made direct identical digital copies of Plaintiffs' works and thereafter automated the removal of its CMI. SAC ¶¶, 91, 94–97, 143–44.

In its First MTD Order (ECF No. 95) this Court held that Plaintiffs had sufficiently alleged violations of DMCA §§ 1202(b)(1) and 1202(b)(3) because Plaintiffs had plausibly alleged

1   that their "licensed code contain[ed] CMI," and that "Defendants removed or altered that CMI

2   from licensed code, distributed CMI knowing CMI had been removed or altered, and distributed

3   copies of the code knowing that CMI had been removed or altered, all while knowing and

4   possessing reasonable grounds to know that doing so would induce infringement." *Doe 1*, 672 F.

5   Supp. 3d 837, 857.

6        In its Second MTD Order, however, the Court dismissed Plaintiffs' DMCA claims solely

7   on the grounds that "no DMCA violation exists where the works are not identical," and Plaintiffs

8   had failed to satisfy this requirement "[b]ecause the Complaint characterized Copilot output as 'a

9   "modified format,' 'variation[ ],' or the 'functional[ ] equivalent' of the licensed code." ECF

10   No. 189 at 15 (quoting FAC ¶¶ 103, 110, 120).

11        In sum, this Court has already held that Plaintiffs have otherwise sufficiently pled DMCA

12   violations under §§ 1202(b)(1) and 1202(b)(3). The sole issue remaining before the Court is

13   whether Plaintiffs' SAC sufficiently alleges that Copilot produces "identical" copies of Plaintiffs'

14   licensed code. For the following reasons, and for the reasons the Court set forth in its First MTD

15   Order, Plaintiffs' SAC satisfies this requirement, and thus Plaintiffs' claims under §§ 1202(b)(1)

16   and 1202(b)(3) for injunctive relief should not be dismissed.

17        **1.**     **Plaintiffs' DMCA claims are plausibly alleged under any standard**

18        Plaintiffs do not seek to relitigate previous arguments concerning the DMCA's alleged

19   "identicality" requirement and its application to the facts in this case. Plaintiffs, however, ask this

20   Court to address new issues arising in relation to this standard and its application to software code

21   in particular—issues that were either never previously raised or addressed in prior briefing or the

22   Court's Second MTD Order.[1]

23        Relatedly, Plaintiffs ask this Court to reconsider the caselaw on which it relied in reaching

24   its "identicality" holding in the Second MTD Order, particularly in light of the recent district

25

---

26   [1] ECF No. 189 ("A court may consider a motion "to the extent it presents issues not previously resolved." (quoting *Jones v. Life Ins. Co. of N. Am.*, No. 08-CV-03971-RMW, 2015 WL 8753996, at

27   *3 (N.D. Cal. Dec. 15, 2015)). While Plaintiffs acknowledge that there is a pending motion for reconsideration of the Court's Order on the FAC MTD, the arguments asserted herein also differ

28   from the arguments raised there.

1  court decision in *ADR Int'l Ltd. v. Inst. for Supply Mgmt. Inc.*, 667 F. Supp. 3d 411 (S.D. Tex.

2  2023) ("*ADR Int'l*"), where this alleged "identicality" element was squarely rejected. *See id.* at

3  427–29 (finding no "identicality" requirement for DMCA claims after examining the statutory

4  language, legislative history, and caselaw).

5         **a.**       **Identicality is not an element of a DMCA § 1202 claim**

6        The plain language of DMCA § 1202 makes it a violation to remove or alter CMI. It does

7  not require that the output work be original or identical to obtain relief. *See* 17 U.S.C.

8  § 1202(b)(1). Similarly, the definition of "copy" under the DMCA includes no requirement of

9  identicality. *See* 17 U.S.C. § 1202(c). Indeed, the DMCA contains only one mention of the word

10  "identical"—as an exemption under Section 1201 for certain types of institutions. *See* 17 U.S.C.

11  § 1201(d)(2) ("The exemption made available under paragraph (1) shall only apply with respect

12  to a work when an *identical* copy of that work is not reasonably available in another form.")

13  (emphasis added). One can presume therefore that Congress could have required an "identical

14  copy" element into other sections of the DMCA if it so intended.

15        To be considered a copy under the DMCA, the "allegedly infringing work must be fixed in

16  some tangible form from which the work can be perceived, reproduced, or otherwise

17  communicated, either directly or with the aid of a machine or device." *Columbia Pictures Indus.,*

18  *Inc. v. Galindo*, No. 20-cv-3129-MEMF (GJSx), 2022 WL 17094713, at *8 (C.D. Cal. Nov. 18,

19  2022) (citing 17 U.S.C. § 101). The statute defines CMI as "information conveyed in connection

20  with copies . . . of a work[.]" 17 U.S.C. § 1202(c). By a plain reading of the statute, there is no

21  need for a copy to be identical—there only needs to be copying, which Plaintiffs have amply

22  alleged. *See, e.g.*, SAC ¶¶ 112–40.

23        The DMCA was enacted to protect copyrights in the digital era where digital copies can

24  be made and disseminated in an instant. *See, e.g.*, *Textile Secrets Int'l, Inc. v. Ya-Ya Brand Inc.*, 524

25  F. Supp. 2d 1184, 1199 (C.D. Cal. 2007) ("With this evolution in technology, the law must adapt

26  in order to make digital networks safe places to disseminate and exploit copyrighted works."); *see*

27  *also* S. Rep. No. 105-190, at 2 (1998) ("[T]he law must adapt in order to make digital networks

28  safe places to disseminate and exploit copyrighted materials") (footnote call numbers omitted).

Here, Plaintiffs allege that OpenAI utilized identical digital copies of their copyrighted works to train Codex (SAC, ¶¶ 91, 95–97) and removed the CMI from it knowing that Copilot (which runs on top of Codex and which OpenAI codeveloped with GitHub, *id.* at ¶ 59) reproduces Plaintiffs' copyrighted code identically, without attribution, notice, or any of the other requirements that may adhere from the applicable license. *Id.* at ¶¶ 102–03, 145–49. OpenAI knowingly enables and induces Copilot users to infringe on Plaintiffs' exclusive right under § 106(2) of the Copyright Act to prepare derivative works. 17 U.S.C. § 106(2); *see* SAC, ¶¶ 90–105. Liability is established under DMCA § 1202 (b)(1) when CMI is removed from digital copies knowing doing so "will induce, enable, facilitate, or conceal an infringement of *any right* under this title." 17 U.S.C. § 1202(b).

*None* of the cases that Defendants previously relied on—and this Court cited in its Second MTD Order adopting an "identicality" standard for DMCA violations—explain the origins of this so-called standard. For good reason—there is no support from statutory language, legislative history, or potentially analogous interpretations of "copying" under the Copyright Act. In fact, careful review of many of these cases also cite other cases that never discussed the issue of "identicality" (despite being cited for that proposition).

For example, this Court (and Defendants) cited *Kirk Kara Corp. v. W. Stone & Metal Corp.*, No. CV 20-1931-DMG (EX), 2020 WL 5991503, at *6 (C.D. Cal. Aug. 14, 2020) as central support for the DMCA's alleged "identicality" requirement. *Kirk Kara*, however, never examined the standard, and instead relied on three cases, each of which provide no support for it. As the court in *ADR Int'l* noted, the *Kirk Kara* court cited *Kelly v. Arriba Soft Corp.*, 77 F. Supp. 2d 1116, 1122 (C.D. Cal. 1999) and *Frost-Tsuji Architects v. Highway Inn, Inc.*, No. CIV 13-00496 SOM, 2015 WL 263556, at *2 (D. Haw. Jan. 21, 2015), "but neither [of these cases] mentioned nor employed an identical copies requirement." *ADR Int'l,* 667 F. Supp. 3d. at 427. The *Kirk Kara* court similarly cited *Fischer v. Forrest*, 286 F. Supp. 3d 590 (S.D.N.Y. 2018), yet the term "identical" appears nowhere in the decision. To the contrary, in the *Fischer* court's brief discussion of whether sufficient copying had occurred, the court did not apply an identicality standard at all, stating that where DMCA claims had been adequate, "the underlying work has

1   been *substantially* or entirely reproduced." *Id.* at 609 (emphasis added); *see also ADR Int'l*, 667 F.

2   Supp. 3d at 427 (rejecting *Kirk Kara*'s reliance on *Fischer*).

3   Notably, in *ADR Int'l,* the district court expressly rejected OpenAI's claim that the

4   DMCA included an "identicality" requirement in part by dissecting the very cases on which

5   OpenAI here—and this Court in its Second MTD Order—relied on when imposing an

6   "identicality" requirement on DMCA violations. *ADR Int'l*, 667 F. Supp. 3d at 427–29

7   (observing that "Defendants' cases do not require a plaintiff to plead allegedly infringing works

8   are identical copies" and recognizing "the one case that requires identical copies [i.e., *Kirk Kara*]

9   is not well reasoned.").

10   The *ADR Int'l* court also held that neither the statute's plain language nor its legislative

11   history—which the district court examined (unlike the cases that OpenAI relies on)—supported

12   an "identicality" requirement. Instead, well-established standards of statutory construction

13   compelled the opposite conclusion, namely, that "copying" under the DMCA should align with

14   "copying" under the Copyright Act, given that the DMCA is contained in Chapter 12 of the

15   Copyright Act and, therefore, subject to Section 101 of the Copyright Act's definition of copying.

16   Section 101 defines "copies" as "material objects, other than phonorecords, in which a work is

17   fixed by any method now known or later developed, and from which the work can be perceived,

18   reproduced, or otherwise communicated, either directly or with the aid of a machine or device."

19   17 U.S.C. § 101. This definition "lacks any requirement for an identical copy." *ADR Int'l*, 667 F.

20   Supp. 3d at 427*; cf. Murphy v. Millennium Radio Grp. LLC*, 650 F.3d 295, 305 (3d Cir. 2011)

21   ("Defendants are essentially asking us to rewrite § 1202 to insert a term—that is, 'automated

22   copyright protection or management system'—which appears nowhere in the text of the DMCA

23   and which lacks a clear definition. We would need compelling justification indeed to adopt such a

24   statutorily-unmoored interpretation.").

25   In accord with this correct analysis, courts have routinely declined to require identicality

26   when evaluating DMCA claims under a standard drawn directly from Copyright Act infringement

27   claims. *See, e.g.*, *Friedman v. Live Nation Merch., Inc.*, 833 F.3d 1180, 1188 (9th Cir. 2016);

28   *Widespread Elec. Sales, LLC v. Upstate Breaker Wholesale Supply, Inc.*, No. 3:20-CV-2541-K, 2023

1   WL 8721435, at *1 (N.D. Tex. Dec. 17, 2023); *Software Pricing Partners, LLC v. Geisman*, No.

2   3:19-cv-00195-RJC-DCK, 2022 WL 3971292, at *5 (W.D.N.C. Aug. 31, 2022) ("Geisman, as a

3   former employee of SPP, reasonably knew that such information was copyrighted work and knew

4   he was altering it by changing it enough to look like his own work while maintaining a substantial

5   similarity to the original work. Accordingly, Geisman is liable for violating the DMCA."). Under

6   the DMCA, all these actions would fail if courts adhered to the "identicality" standard OpenAI

7   proposes—and which this Court adopted in the Second MTD Order. OpenAI has not cited a

8   single case holding that the standard for "copying" under the DMCA is higher than the

9   Copyright Act or that the statutes should be read disharmoniously.

10          In addition to being incorrect, adopting OpenAI's rigid "identicality" standard to

11  software code also has uniquely troubling implications given that mere cosmetic differences

12  between the original and copied code are not probative of whether the copied code is "identical."

13  *See* 17 U.S.C. § 1201(d)(2) (containing the only mention of the word "identical" in 17 U.S.C.

14  § 1201(d)(2) regarding an exemption for public institutions); *see also* S. Rep. No. 105-190, at 31

15  (1998) (explaining the meaning of public institution exemption and requirement that copies be

16  "identical" for exemption to apply). The decision in *Oracle Int'l Corp. v. Rimini St., Inc.*, No. 2:14-

17  cv-01699-MMD-DJA, 2023 WL 4706127 (D. Nev. July 24, 2023) is especially instructive. There,

18  the court rejected the party's argument "that a work that removes copyright management

19  information must be an *exact copy of the original work*." *Id.* at *82 (emphasis added). The court

20  stated that "this construction of the DMCA" demanding an exact copy—the same construction

21  OpenAI demands in this case—"would weaken the statute's intended protections for copyright

22  holders" and that "when a defendant modifies source code 'substantially similar'" to the

23  underlying "copyrighted source code, including by replacing the author's name with its own, the

24  defendant is liable under the DMCA." *Id.* (internal quotations omitted); *Rimini St., Inc.*, 2023

25  WL 4706127, at *14 (examining whether copies of code were "substantially similar"). In a case

26  involving software code in this very district, the court found that an allegation of CMI removal

27  from code that is derivative of a plaintiff's copyrighted source code is sufficient at the pleading

28  stage to sustain a DMCA § 1202 claim. *See Splunk Inc. v. Cribl, Inc.*, 662 F. Supp. 3d 1029, 1053

(N.D. Cal. 2023). Identicality is simply not an element of a Section 1202 claim.

### b. Plaintiffs allege that Copilot reproduces identical copies of Plaintiffs' code

Even if "identicality" were actually an element of a DMCA violation, Plaintiffs' allegations under §§ 1202(b)(1) and (b)(3) still satisfy this standard. Plaintiffs have plausibly alleged that any differences between Copilot-generated code and Plaintiffs' original code are "immaterial" and "semantically insignificant"—in other words: identical. *See, e.g.*, SAC ¶ 108.

Plaintiffs identify several instances where Copilot *has* reproduced verbatim, (i.e., identical) copies of Plaintiffs' code. *See* SAC ¶¶ 135, 137. Plaintiffs note that "[w]hen Copilot is prompted with the first section of Doe 5's code . . . [t]he first suggestion from Copilot offers . . . a verbatim copy of Doe 5's original code." *Id.* at ¶ 135. Plaintiffs similarly allege that Copilot reproduces "a verbatim copy of Doe 5's code (except for small cosmetic variations in line breaks)" when prompted by different lines of Doe 5's code. *Id.* at ¶ 137. Line breaks do not comprise the copyrighted work as they are not "semantically meaningful," *id.* at ¶ 72, and thus any difference in line breaks between Copilot output and Plaintiffs' code are immaterial to the analysis.

Elsewhere, the SAC plausibly alleges that Copilot reproduces code sufficient to satisfy an "identicality" requirement, because minor deviations between the original code and Copilot's copy of that code are "immaterial" or "semantically insignificant variations of the original Licensed Materials." *Id.* at ¶ 108. With respect to Doe 2, Plaintiffs allege that slight differences in three key words still render the Copilot code "semantically equivalent" and that the code is otherwise "a verbatim copy" of the original code. *Id.* at ¶ 115. Plaintiffs further allege that "the particular arrangement and sequencing seen in [Doe 2's] code is distinctive expression found only in one location on GitHub." *Id.* Similarly, Plaintiffs allege that Copilot clearly reproduces Doe 1's code given that its omitted output only contains "cosmetic" differences that do not affect the way the code functions, and that the output even contains Doe 1's actual "comments in the code"—in other words, the coder's own expressive commentary about his own code, which could only come from Doe 1, further evidencing copying. *Id.* at ¶ 121.

1    Plaintiffs further allege that Copilot renders a "verbatim copy" of Doe 5's original code

2    except with an aspect of the code that is immaterial to the question of whether it has been copied.

3    *Id.* ¶ 128. The renaming of variables is akin to renaming James Bond as "Jim Bond": republishing

4    the popular 007 movie series would still constitute an act of infringement irrespective of the new

5    names. Indeed, the SAC is replete with allegations making clear that the scant "cosmetic"

6    differences in Copilot-generated code have no bearing on whether the Copilot-generated code is

7    "functionally equivalent" or identical to Plaintiffs' code. *See, e.g.*, *id.* at ¶¶ 122, 131, 137. Plaintiffs

8    also allege that these small cosmetic differences are "a feature, not a bug" that enables "Copilot

9    to conceal the copying of Licensed Materials." *Id.* at ¶ 155.

10    OpenAI's contention that minor differences in line breaks, capitalization, or variable

11    names defeat a finding of identicality is a factual argument that can be tested through expert

12    testimony showing that these modifications are, in fact, material such that the code is, in fact, *not*

13    identical. *See, e.g.*, *Rimini St., Inc.*, 2023 WL 4706127, at *14 ("Ms. Frederiksen-Cross performed

14    analytic dissection as part of her comparison of RSI810ST.SQR against TAX810DC.SQR. She

15    determined that the RSI810ST.SQR file contains substantial portions of Oracle's protected

16    expression and was substantially similar to Oracle's TAX810DC.SQR file. Examples of Oracle's

17    protected expression within the RSI810ST.SQR file include, "blocks of identical lines that are

18    performing exactly the same function using identical code in the same order.") (internal citations

19    omitted). But this case is about *code*. Minor differences may have no implication as to whether the

20    code functions identically or not.

21    In addition, Plaintiffs' SAC contains new allegations regarding Copilot's duplicate-

22    detection feature, which GitHub created "in response to public criticism of Copilot's

23    mishandling of Licensed Materials." *Id.* at ¶ 145. As Plaintiffs allege, the feature "either allow[s]

24    or block[s] code completion suggestions that match publicly available code." *Id.* In other words,

25    the feature was created because GitHub, OpenAI, and the other defendants *knew* that Copilot was

26    emitting verbatim copies of licensed code on which it had trained. *See id* at ¶¶ 144–48. A tool that

27    attempts to block Copilot from producing output that is identical to code hosted in public GitHub

28    repositories *by definition* establishes Copilot's ability to reproduce verbatim copies of code.

1  Moreover, as Plaintiffs allege, "even assuming the filter works as advertised, because it only

2  checks for verbatim excerpts, it does nothing to impede the Outputs from Copilot that are

3  modifications of Licensed Materials." *Id.* at ¶ 145. In other words, code that includes minor

4  differences in line breaks, capitalization, or even order of enums—all semantically "immaterial

5  differences"—are not necessarily flagged by the feature. *Id.*

6      At the pleading stage, Plaintiffs' allegations regarding the duplicate-detection feature

7  clearly bolster the plausibility of Plaintiffs' claims that Copilot produces identical code and is

8  substantially likely to continue producing Plaintiffs' licensed code.

9              **2.      The DMCA does not require an entire work to be copied**

10     OpenAI also claims, without citation to a single authority, that "the reproduction of short

11  passages that may be part of [a] larger work, rather than the reproduction of an entire work, is

12  insufficient to violate [DMCA] Section 1202." OpenAI Br. at 5. But the DMCA has no such

13  requirement.

14     Like OpenAI's "identicality" argument, its claim that DMCA liability attaches only

15  where the offending party has copied an "entire work" contravenes the most basic tenets of

16  copyright law. By OpenAI's logic, a party could copy and distribute a fragment of a copyrighted

17  work—say, a chapter of a book, a stanza of a poem, or a scene from a movie—and face no

18  repercussions for infringement. Courts, however, have routinely acknowledged that "[e]ven a

19  small amount of the original, if it is qualitatively significant, may be sufficient to be an

20  infringement" even where "the full original could not be recreated from the excerpt." *Horgan v.*

21  *Macmillan, Inc.*, 789 F.2d 157, 162 (2d Cir. 1986); *see also Burroughs v. Metro–Goldwyn–Mayer, Inc.*,

22  683 F.2d 610, 624 n.14 (2d Cir. 1982).

23     OpenAI's unsupported theory would render the DMCA toothless by allowing anyone to

24  copy another's work so long as they only copied a part of it. But " '[n]o plagiarist can excuse the

25  wrong by showing how much of his work he did not pirate.' " *Shaw v. Lindheim*, 919 F.2d 1353,

26  1362 (9th Cir. 1990), *overruled by Skidmore v. Led Zeppelin*, 952 F.3d 1051 (9th Cir. 2020).

27

28

PLAINTIFFS' OPPOSITION TO OPENAI'S MOTION TO DISMISS THE SECOND AMENDED
COMPLAINT

**B.    Plaintiffs Adequately Allege Breach of Contract by OpenAI Through Its Mass Violation of Open-Source Licenses**

In its initial Motion to Dismiss, OpenAI urged the Court to dismiss Plaintiffs' breach of contract claim (Count II), contending that Plaintiffs had failed to plead the existence of a contract and failed to identify the actual contractual provisions OpenAI had breached. ECF No. 53 at 13–15. The Court rejected these arguments wholesale, holding Plaintiffs had sufficiently alleged "that Codex and Copilot reproduce licensed code as output without attribution, copyright notice, or license terms, thereby violating the relevant provisions of each license," and that while Plaintiffs had not identified "the specific subsections of each suggested license that correspond to each of these requirements," they had "sufficiently identified 'the contractual obligations allegedly breached,' as required to allege breach of contract. *Doe 1*, 672 F. Supp. 3d at 860.

Plaintiffs then filed their FAC, leaving their breach-of-contract allegations unchanged. OpenAI did not move to dismiss this count. ECF No. 110. In the SAC, the same nucleus of facts underlying Plaintiffs' breach of contract claim remain unchanged. After filing the SAC—which contains the very same breach of contract claim upheld by this Court in its First MTD Order—OpenAI sought another bite at the apple, advancing two central claims for the first time.

First—that Plaintiffs have failed to allege a breach based on the operation of OpenAI's Codex and thus have failed to state a claim against OpenAI based on Codex given that "GitHub" is allegedly a "separate product" from Copilot. OpenAI Br. at 7–8.

Second—that Plaintiffs have failed to articulate a theory of breach of contract because OpenAI never adhered to the licensing "conditions" to begin with, meaning its use of the Plaintiffs' Licensed Materials was never in fact governed by the attached licenses. *Id*. at 10.

For the reasons below, OpenAI's arguments fail.

**1.    OpenAI's failure to raise these arguments before forecloses OpenAI's Rule 12 motion under Rule 12(g)(2)**

"Rule 12(g)(2) provides that a defendant who fails to assert a failure-to-state-a-claim defense in a pre-answer Rule 12 motion cannot assert that defense in a later pre-answer motion under Rule 12(b)(6)" though "the defense may be asserted in other ways." *In re Apple iPhone*

1   *Antitrust Litig.*, 846 F.3d 313, 318 (9th Cir. 2017) (citing Fed. R. Civ. P. 12(g)(2) & (h)(2)); *see also*

2   Fed. R. Civ. P. 12(g)(2) ("Except as provided in Rule 12(h)(2) or (3), a party that makes a motion

3   under this rule must not make another motion under this rule raising a defense or objection that

4   was available to the party but omitted from its earlier motion."). "The sole Rule 12 exception is

5   that a party may subsequently raise the foreclosed issue 'in a post-answer motion under

6   Rule 12(c)'; otherwise, the party may validly raise the issue 'in a pleading under Rule 7 . . . or at

7   trial." *In re Packaged Seafood Prods. Antitrust Litig.*, 277 F. Supp. 3d 1167, 1174 (S.D. Cal. 2017)

8   (quoting *Apple iPhone*, 846 F.3d at 318). Moreover, when assessing a 12(g)(2) motion, district

9   courts consider the prejudice to plaintiffs in allowing a defendant to seek dismissal of claims on

10   grounds that could have been brought through an earlier motion. *See, e.g.*, *Harrell v. City of Gilroy*,

11   No. 17-CV-05204-LHK, 2019 WL 452039, at *8 (N.D. Cal. Feb. 5, 2019) (noting that courts have

12   discretion to consider successive Rule 12(b)(6) motions if the motion does not prejudice the

13   plaintiff and expedites resolution of the case.").

14        The facts in this case are precisely why Rule 12(g)(2) exists: "to avoid repetitive motion

15   practice, delay, [or] ambush tactics." *Packaged Seafood Prods.*, 277 F. Supp. 3d at 1174 (quotations

16   omitted and alteration in the original). This is OpenAI's *third* motion to dismiss; yet, its *first* time

17   arguing for a Rule 12 dismissal of Plaintiffs' breach of contract claims—which have not changed

18   one iota in any of the complaints. *Compare* ECF No. 201 *with* ECF No. 1. OpenAI has known of

19   these allegations for nearly 16 months, when Plaintiffs filed their initial Complaint. ECF No. 1.

20   Nothing prevented OpenAI from making the exact same breach of contract arguments it pursues

21   today, and OpenAI has offered no explanation as to why it failed to raise these argument earlier.

22   Nor has OpenAI explained why it failed to raise these arguments in its second motion to dismiss,

23   instead sitting silent until its third round of Rule 12(b)(6) briefing. *See Mario V. v. Armenta*, No.

24   18-cv-00041-BLF, 2019 WL 81337140, at *2 (N.D. Cal. Apr. 17, 2019) (denying subsequent Rule

25   12(b)(6) motion under Rule 12(g)(2) where "Plaintiffs filed their original complaint more than a

26   year ago," "Defendants' first motions to dismiss were litigated more than eight months ago" and

27   "[t]he issues now raised by Defendants could have, and under the Federal Rules should have,

28   been litigated then.").

1    OpenAI should not be rewarded for its delay in advancing breach of contract arguments

2    that could have been made on two prior occasions and, notably, before discovery had commenced.

3    At this point in the case, however, Plaintiffs have issued numerous discovery requests pertaining

4    to their breach of contract claims, met and conferred on these issues in person, exchanged six

5    letters in relation to discovery, and also filed one joint letter brief with the Court. Indulging

6    OpenAI's belated attempt to dismiss Plaintiffs' breach of contract claim at this stage in the

7    litigation would thus be manifestly unjust to Plaintiffs. *See Packaged Seafood Prods.*, 277 F. Supp.

8    3d at 1174 ("[T]o refuse to enforce Rule 12(g)(2)'s clear command on such a foundational

9    argument as the one Defendants here urge . . . would set a dangerous precedent regarding the

10   ability to continually hamstring a plaintiff with wave after wave of motions to dismiss.").

11   Notwithstanding that OpenAI has waived its right challenge Plaintiffs' breach of contract

12   claim, its arguments fail on the merits, as well.

13        **2.    Plaintiffs adequately allege breach of contract based on the operation
              of OpenAI's Codex product and its integration into GitHub and
14            OpenAI's joint venture, the Copilot product**

15   OpenAI incorrectly contends that Plaintiffs' breach-of-contract claim should be dismissed

16   as to OpenAI specifically, on the grounds that Plaintiffs' claim only concerns the operation of

17   Copilot and not Codex, and OpenAI bases this assertion that Plaintiffs "acknowledge that

18   OpenAI Codex and GitHub Copilot are different products by different parties." OpenAI Br. at 7.

19   OpenAI's characterization of Codex and Copilot as "different products" made by "different

20   parties" ignores countless allegations in the SAC plausibly alleging a deeply integrated

21   relationship between these products. It also ignores the allegation of a joint venture relationship

22   between OpenAI and GitHub/Microsoft pursuant to which OpenAI has joint and several liability

23   for the claims alleged in the Complaint. SAC ¶ 59; *see also id.* at ¶ 27 (alleging that OpenAI "co-

24   created Copilot and offers it jointly with GitHub"); ¶ 45 ("Each acted as the principal, agent, or

25   joint venture of, or for other Defendants with respect to the acts, violations, and common course

26   of conduct herein alleged"). Both OpenAI's copying and use of Plaintiffs' licensed code through

27   Codex, and Copilot's Codex-based reproduction of Plaintiffs' licensed code gives rise to breach-

28   of-contract claims. *See* SAC ¶ 68 (stating that Codex "has not been trained to provide Attribution.

1 Nor does it include a Copyright Notice nor any License Terms attached to the Output. This is by

2 design"); *id.* at 11 (describing breach of contract claims in "Contract-Related Conduct" section in

3 terms of "[d]efendants violat[ing] the Licenses governing the use of the Licensed Materials by

4 using them to train Copilot and for republishing those materials without appending the required

5 Attribution, Copyright Notice, or License Terms.")

6        Contrary to OpenAI's claims, Plaintiffs allege that "Codex and Copilot are related"

7 precisely because Codex "powers GitHub Copilot, which [OpenAI] built and launched in

8 partnership with GitHub." SAC ¶ 59. Specifically, "GitHub Copilot uses the OpenAI Codex to

9 suggest code and entire functions in real-time." *Id.* at ¶ 47 (quoting GitHub website). Plaintiffs

10 have additionally alleged that both Codex and Copilot fail to identify "any Licensing Terms

11 attached to the Output" as neither was "programmed to treat attribution, copyright notices, and

12 license terms as legally essential." *Id.* at ¶¶ 68, 92. Moreover, Plaintiffs allege that "Defendants

13 have kept secret the details of Codex's modifications and its integration into or interaction with

14 Copilot," *id.* at ¶ 59, which this Court acknowledged in its First MTD Order, *Doe 1*, 672 F. Supp.

15 3d at 851 n.9 (Defendants are "the only parties with knowledge of how Copilot and Codex were

16 designed and operate."). Defendants' lack of transparency underscores the need for discovery on

17 this very point.

18        In addition to Plaintiffs' allegations regarding Codex's integration into Copilot, Plaintiffs

19 specifically allege that GitHub and OpenAI "launched Copilot in June 2021" and that they "co-

20 created Copilot" as a joint venture and jointly share in its profits. SAC ¶¶ 26–27, 45, 59, 225.

21 Parties to a joint venture are jointly and severally liable for the actions of their partners. *See, e.g.*,

22 *Myrick v. Mastagni*, 185 Cal. App. 4th 1082, 1091 (2010) ("The incidents of a joint venture are in

23 all important respects the same as those of a partnership. One such incident of partnership is that

24 all partners are jointly and severally liable for partnership obligations, irrespective of their

25 individual partnership interests." (quoting 9 Witkin, Summary of Cal. Law (10th ed. 2005)

26 Partnership, § 9, p. 584.)). And "where there is a joint venture, all members of a joint venture are

27 liable for contracts executed by another member in furtherance of the joint venture." *Forest v.*

28 *Equitable Life Assurance Soc'y of U.S.*, No. C99-5173 SI, 2001 WL 1338809, at *4 (N.D. Cal. June

12, 2001) (collecting cases).

### 3. OpenAI's failure to abide by open-source licenses adequately supports a breach-of-contract claim

Although this Court already upheld Plaintiffs' breach-of-contract claim in its First MTD Order, OpenAI now argues that this claim should be dismissed because the attribution and notice requirements imposed by Plaintiffs' Suggested Licenses are conditions of the copyright license rather than covenants. OpenAI Br. at 10. OpenAI claims that "failure to meet a condition does not give rise to a claim for breach of contract." *Id.* at 18. Thus, if "Plaintiffs are right that there has been a failure to fulfill the attribution and notice terms," OpenAI claims, the consequence of that failure is that no license was granted, and Plaintiffs may only seek redress through a copyright infringement action brought under the Copyright Act. *Id.* at 10, 26.

As discussed below, OpenAI is plainly wrong on the law. That the Suggested Licenses create an enforceable contract is not novel. The facts giving rise to this claim are straightforward—indeed, this Court has recognized that Plaintiffs have pleaded all elements of a breach of contract claim based on the Suggested Licenses. *Doe 1*, 672 F. Supp. 3d at 859–60. This Court is not alone in upholding breach of contract claims based on OSLs—several courts have upheld breach of contract claims involving OSLs, including some of the very Suggested Licenses at issue in this case. *See, e.g.*, *Software Freedom Conservancy, Inc. v. Vizio, Inc.*, No. 8:21-cv-01943-JLS-KES, 2022 WL 1527518, at*3 (C.D. Cal. May 13, 2022) ("*SFC*"); *Artifex Software, Inc. v. Hancom, Inc.*, No. 16-CV-06982-JSC, 2017 WL 1477373, at *3 (N.D. Cal. Apr. 25, 2017). Instead, OpenAI's positions would appear to upset any claim that these OSLs are valid or enforceable. As in accord with how these courts have concluded, that is wrong.

OpenAI's position also ignores that Plaintiffs have alleged far more than breaches of attribution and notice requirements. *See, e.g.*, SAC ¶¶ 244, 247. Thus, even if OpenAI is correct about its willful breach of attribution and notice terms in the OSLs at issue in this case (it is not), at most this would warrant a narrowing of Plaintiffs' breach of contract claim—not dismissal of it.

a.   **Plaintiffs sufficiently plead breach of contract because the attribution and notice requirements of OSLs are properly considered covenants and not conditions**

OpenAI argues that attribution and notification duties are "conditions" of the grant of the copyright license, breach of which can only be remedied by a copyright infringement claim rather than pursuant to a breach of contract claim. OpenAI Br. at 10–19. Make no mistake—OpenAI's ambition here is to utterly eviscerate open-source licensing in the large, including the OSLs that required it to provide attribution and notice of the source code it used to create Codex and Copilot, as well as provide such attribution and notice when those models reproduce identical copies of Plaintiffs' source code. *Id.*

As a baseline, a "copyright owner who grants a nonexclusive, limited license ordinarily waives the right to sue licensees for copyright infringement, and [] may sue only for breach of contract." *Ticketmaster L.L.C. v. Prestige Ent., Inc.,* 306 F. Supp. 3d 1164, 1172 (C.D. Cal. 2018) (quoting *Sun Microsystems, Inc. v. Microsoft Corp.,* 188 F.3d 1115, 1121 (9th Cir. 1999)) (internal quotations omitted). "However, if the licensee acts outside the scope of the license, the licensor may sue for copyright infringement." *Id.* (quoting *MDY Indus., LLC v. Blizzard Ent., Inc.*, 629 F.3d 928, 939 (9th Cir. 2010)). The Ninth Circuit has referred to contractual terms that limit a copyright license's scope as "conditions," the breach of which constitute copyright infringement, but it refers to all other license terms as "covenants," the breach of which is actionable only under contract law. *MDY Indus.*, 629 F.3d at 939, *as amended on denial of reh'g* (Feb. 17, 2011), *opinion amended and superseded on denial of reh'g,* No. 09-15932, 2011 WL 538748 (9th Cir. Feb. 17, 2011). The distinction between conditions and covenants is decided "according to state contract law" and "[w]herever possible, equity construes ambiguous contract provisions as covenants rather than conditions." *Id.*

Under some interpretations of contract law, "conditions" relate to mutually agreed limitations on the scope of the licensor's limited use of the copyrighted material. "A condition is created by the *mutual* assent of the parties and is binding on both, while a covenant is binding on the covenantor only." *Ticketmaster,* 306 F. Supp. 3d at 1172–73 (emphasis added). Under California law, contractual provisions can also operate as both conditions and covenants, *see, e.g.*,

1   *Call v. Alcan Pac. Co.*, 251 Cal.App.2d 442, 447 (1967), and parties can either treat the contract as

2   terminated or enforce the covenant, *see, e.g.*, 1 Witkin, Summary of Cal. Law, Contracts § 801

3   (2023) ("The same fact or act can be both a condition and a promise"); 13 Williston on Contracts

4   § 38:15 (collecting cases). Importantly, describing terms in a license as "conditions" does *not*

5   control whether a term is treated as a condition or covenant under contract law. Instead, whether

6   a term may serve as a condition, limiting the scope of a license, depends on "the whole contract,

7   its purpose, and the intention of the parties" regardless of whether it is referred to as a

8   "condition." *Ticketmaster,* 306 F. Supp. 3d at 1173 (*quoting JMR Constr. Corp. v. Env'l Assessment*

9   *& Remediation Mgmt., Inc.*, 243 Cal. App. 4th 571, 596 (2015)); *see also Pac. Allied v. Century Steel*

10   *Prods.*, 162 Cal. App. 2d 70, 79–80 (1958) (conditions are disfavored by the law). Generally,

11   "[c]onditions precedent are disfavored and will not be read into a contract unless required by

12   plain, unambiguous language." *Netbula, LLC v. Storage Tech. Corp.,* No. C06-07391 MJJ, 2008

13   WL 228036, at *3 (N.D. Cal. Jan. 18, 2008) (quoting *Effects Associates, Inc. v. Cohen*, 908 F.2d 555,

14   559 n.7 (9th Cir. 1990)).

15   OpenAI's brief includes a multipage table that quotes extensively from some of the OSLs

16   at issue in the SAC. OpenAI Br. at 11–17. The length of OpenAI's table is meant to distract from

17   its cramped and conclusory legal argument: that the mere use of the magic language "provided

18   that" and "condition" in every case necessarily creates terms that are legally conditions, not

19   covenants. OpenAI Br. at 11, 16. Not so.

20   In the first instance, OpenAI's blanket assertions about the meaning of the world's most

21   popular OSLs—all of which are at issue in this case—would imperil the entire ecosystem of

22   open-source licensing. OpenAI's position that every OSL merely imposes conditions, not

23   covenants, would mean that software coders have no redress for violation of their OSLs *unless*

24   they have registered their code with the Copyright Office and bring a copyright-infringement

25   action in federal court. Indeed, Plaintiffs suspect that GitHub and Microsoft have not sought to

26   join OpenAI's argument on this issue because it would cause a four-alarm public-relations

27   firestorm among the millions of open-source programmers who have relied on GitHub's

28   representations that OSLs are meaningful, not illusory. SAC at 10, n.4 (enumerating the 11

"Suggested Licenses" that are at issue in the SAC and form part of the definition of the proposed class).

OpenAI is likely correct that as part of this litigation, the meaning of the Suggested Licenses in the context of other admissible evidence under California contract law will need to be determined. But not on the simplistic and incomplete basis OpenAI proposes. Rather, the project will require this Court to consider the text of the licenses separately, and interpret "the whole contract, its purpose, and the intention of the parties." *Ticketmaster,* 306 F. Supp. 3d at 1173. Common evidence will likely be relevant, but ultimately, the "intention of the parties" is an issue of fact that cannot be resolved as part of a motion to dismiss, especially because all inferences must still be drawn in Plaintiffs' favor. *Laborers Health Welf. Tr. Fund v. Kaufman & Broad of N. Cal., Inc.*, 707 F.2d 412, 418 (9th Cir. 1983) (contractual "intent . . . is a question for the trier of fact); *McShannock*, 976 F.3d at 886–87. Plaintiffs specifically allege facts showing Plaintiffs intent that the Suggested Licenses create enforceable contracts to relevant license terms. OpenAI improperly seeks to foreclose this whole process, encouraging this Court to adopt a permanent interpretation of these OSLs based on selective quotations in its Rule 12 motion. OpenAI Br. at 11–17. As a procedural and substantive matter, this invitation should be declined.

### a.    *Jacobsen v. Katzer* **is not determinative**

The main case OpenAI cites in support of its position is *Jacobsen v. Katzer*, 535 F.3d 1373 (Fed. Cir. 2008).[2] In *Jacobsen*, the plaintiff, who had registered his code with the Copyright Office, offered software under an open-source license called the Artistic License. *Id.* at 1375–76. The central issue on appeal was not whether plaintiff there had adequately pled a *breach of contract claim*, but whether the district court erred in dismissing plaintiff's *copyright infringement* claim. *Id.* at 1377. In the words of the *Jacobsen* court, "[t]he heart of the argument on appeal concerns whether the terms of the Artistic License are conditions of, or merely covenants to, the copyright license," because "if the terms of the Artistic License allegedly violated are both covenants and conditions, they may serve to limit the scope of the license and are governed by contract law." *Id.*

---

[2] Plaintiffs note that decisions of the Federal Circuit are not binding.

1   at 1380. If the terms were "merely covenants, by contrast, they are governed by contract law." *Id.*

2       Specifically, the court analyzed whether the attribution and notice requirements in the

3   Artistic License defendants had allegedly violated were "conditions of, or merely covenants to,

4   the copyright license*." Id.* at 1381. The appeals court held that the requirements were "conditions

5   to the scope" of the license. *Id.* at 1382. But critical to the *Jacobsen* court's holding were

6   contractual features specific to the Artistic License—namely, that the attribution and notice

7   requirements had to be harmonized with the "Preamble" of the Artistic License, which expressly

8   recognized that "[t]he intent of th[e] document [wa]s to state the conditions *under which* a

9   Package may be copied." *Jacobsen*, 535 F.3d at 1381 (emphasis added). So yes, the *Jacobsen* court

10  did find that the attribution and notice requirements of the Artistic License were conditions—but

11  only after engaging in the necessary holistic contractual analysis in the context of determining

12  whether a copyright registrant had the right to bring a copyright infringement claim. *See*

13  *Ticketmaster,* 306 F. Supp. 3d at 1173 (determination of condition vs. covenant requires

14  consideration of "the whole contract, its purpose, and the intention of the parties").

15      Even as it cites *Jacobsen* with abandon in its brief, OpenAI makes some careful omissions

16  which defeat its argument. Most conspicuously, OpenAI does not mention that *Jacobsen* dealt

17  with whether an infringement claim could be brought, not whether a breach of contract claim

18  could be brought under the Artistic License's terms. Indeed, OpenAI does not cite (nor have

19  Plaintiffs been able to identify) a single case dismissing a claim where a plaintiff was suing under

20  an open-source license on the grounds that no contract was formed because the terms of the

21  relevant license were conditions rather than covenants. Indeed, *none* of the cases OpenAI cites in

22  support concern breach-of-contract claims but rather copyright-infringement claims.

23      There is good reason why no cases have dismissed contract claims based on OpenAI's

24  novel argument—it is black letter contract law that assent is manifested once intent to perform

25  can be inferred. *See* Restatement (Second) of Contracts § 2 (1981) ("A promisor manifests an

26  intention if he believes or has reason to believe that the promise will infer that intention from his

27  words or his conduct"). *ProCD, Inc. v. Zeidenberg*, 86 F.3d 1447 (7th Cir. 1996) is instructive. In

28  *ProCD*, the court was confronted with a novel issue at the time—whether a license, which was

1  encoded on a compact disc, printed in a manual, and that appeared every time a software runs is

2  binding on the user when the box containing the consumer product merely stated that there were

3  restrictions contained in an enclosed license. *Id.* at 1450. Defendant bought the consumer package

4  of the software but decided to ignore the license. *Id.* The court, applying Wisconsin law,

5  concluded the license was binding and gave the example of a purchaser of an airline ticket:

6  Or consider the purchase of an airline ticket. The traveler calls the carrier
   or an agent, is quoted a price, reserves a seat, pays, and gets a ticket, in
7  that order. The ticket contains elaborate terms, which the traveler can
   reject by canceling the reservation. To use the ticket is to accept the
8  terms, even terms that in retrospect are disadvantageous.

9  *Id.* at 1451.

10  Those principles are no less applicable here. If OpenAI did not wish to be bound by the

11  terms of the Suggested Licenses that adhered to using Plaintiffs' code, it simply could choose not

12  to use them. Indeed, there is code that is published without any license at all. *See, e.g.,* ¶ 185.

13  Rather, OpenAI chose to use Plaintiffs' code, thereby accepting the terms of the Suggested

14  Licenses. OpenAI ignored the licenses instead. That is a breach of contract. Any other answer

15  would undermine the entire software industry by rendering open-source programmers potentially

16  liable for failures to perform while allowing users unfettered use of software without limitation.

17  *See ProCD*, 86 F.3d at 1451-52 (explaining that not recognizing software licenses would render

18  those transactions "unfettered by terms—so the seller has made a broad warranty and must pay

19  consequential damages for any shortfalls in performance, two 'promises' that if taken seriously

20  would drive prices through the ceiling or return transactions to the horse-and-buggy age."").

21  Whether a copyright infringement claim is available is immaterial. *Cf. SFC*, 2022 WL 1527518, at

22  *4 ("Potentially, there is an argument that Vizio's distribution of the software violates various the

23  conditions of the software's copyright; however, SFC has not chosen to bring such claim. *And,*

24  *indeed, because SFC is not the copyright holder, it cannot even assert one*.") (emphasis added).[3]

25

---

26  [3] Plaintiffs observe that unlike here, *Jacobsen* involved code that had been registered with the
    Copyright Office; hence, Jacobsen *could* seek relief under the Copyright Act through an

27  infringement action. While Plaintiffs in this case maintain a copyright interest in their code, *see,*
    *e.g.,* SAC ¶¶ 19-23, none have registered their code with the Copyright Office—indeed, to do so

28  would defeat the purpose of open source and most software code is not registered. OpenAI, itself,

1    Remarkably, OpenAI omits to mention that the Artistic License is **not** one of the OSLs at

2    issue in this case. *See generally* OpenAI Br. at nowhere. The Artistic License is not one of the 11

3    "Suggested Licenses" that form the basis of Plaintiffs' claims. SAC at 10, n.4. So *Jacobsen*, even

4    on its own terms, is merely advisory for this case.

5    Beyond that, none of the OSLs in this case—the aforementioned Suggested Licenses—

6    contain same clear intent as the Artistic License at issue in *Jacobsen* to create conditions and not

7    covenants. Although many of the OSLs at issue here include "provided that" language in sections

8    regarding reproduction and redistribution, these provisions do not operate pursuant to a clear,

9    overarching expressions of intent that the license will be granted only upon their satisfaction.[4] *See*

10   OpenAI Br. at 10–17. In fact, other language is clearly to the contrary.

11   Although OpenAI has scoured the OSLs for conditional language—e.g., "provided that"

12   and "conditions"—the mere fact that conditional language is used in a license does not

13   necessarily indicate that a condition is intended. *Ticketmaster,* 306 F. Supp. 3d at 1173. To treat

14   these terms as merely conditions with respect to the Suggested Licenses would undermine the

15   most basic tenet of contract law, i.e., that terms in a contract are to be read holistically and in

16   keeping with the parties' intent. *Ticketmaster,* 306 F. Supp. 3d at 1173 (citation omitted). This is

17   especially true in this case, where the Suggested Licenses were drafted by different hands, in

18   different jurisdictions, at different times.

19   Further, because none of the OSLs in this case unambiguously suggest that the licensors

20   intended the attribution and notice requirements to operate as conditions precedent to the grant

21

22   has never registered a copyright. Instead, it typically publishes its open-source code through
     OSLs, including two used by Plaintiffs in this case (Apache and MIT). OpenAI's position here

23   would mean that software coders, and companies like OpenAI who routinely use OSLs, are out of

24   luck to enforce the terms of their OSLs *unless* they have registered their code. If not, they cannot
     bring a breach of contract claim (because, as OpenAI argues, no license was granted), and they

25   cannot bring a copyright infringement claim (because, as OpenAI contends, such claims require
     registration). To interpret the OSLs in this case as such—and OSLs more generally—would

26   imperil the entire ecosystem of open-source licensing, including OpenAI's.

27   [4] For instance, the Eclipse Public License 2.0 expressly opens with stating: "ANY USE,
     REPRODUCTION, OR DISTRIBUTION OF THE PROGRAM CONSTITUTES

28   RECIPIENT'S ACCEPTANCE OF THIS AGREEMENT." ECF No. 1-1, Appendix A at 11.

PLAINTIFFS' OPPOSITION TO OPENAI'S MOTION TO DISMISS THE SECOND AMENDED
COMPLAINT

1  of the license, this Court should decline OpenAI's invitation to treat the terms merely as

2  conditions that strip the rights of software coders to enforce their licenses. *Netbula*, 2008 WL

3  228036, at *3.

### b.  Plaintiffs' allegations of OSL violations include "copyleft" requirements that OpenAI completely fails to address

6      Moreover, *Jacobsen* pertained only to violations of attribution and notice requirements.

7  *Jacobsen*, 609 F. Supp. 2d at 933. Here, however, Plaintiffs do not simply allege that OpenAI

8  violated attribution and notice requirements. They also allege that OpenAI "fail[ed] to provide

9  the source code of Copilot nor a written offer to provide the source code upon the request of each

10  licensee," SAC ¶ 254, and failed to provide a copy of the corresponding OSLs with any "copy,

11  redistribution, or derivative of the software code," *id.* at ¶ 184. In other words, Plaintiffs allege

12  violations pertaining to other features of the OSLs that courts since *Jacobsen* have recognized

13  properly fall under contract law. *Artifex Software*, 2017 WL 1477373, at *3 (quoting *Versata*

14  *Software, Inc. v. Ameriprise Fin., Inc.*, No. A-14-CA-12-SS, 2014 WL 950065, at *5 (W.D. Tex.

15  Mar. 11, 2014)).

16      In open-source licensing parlance, license provisions that require users to publish their

17  modifications of licensed source code are called "copyleft" requirements. Copyleft requirements

18  are not a feature of every open-source license, but they are part of six of the 11 Suggested

19  Licenses at issue in this case.[5] These OSLs are also among the most ubiquitous OSLs and are

20  commonly attached to code published in GitHub's public repositories. For instance, the four

21  GNU copyleft licenses open with a Preamble that celebrates "free software" and the right to

22  "receive source code or . . . get it if you want it," including the right to "change the software or

23  use pieces of it in new free programs; *and that you know you can do these things*." *See id.* at 16, 29,

24  35, 49 (emphasis added).

25      Every court that has considered breach of copyleft provisions in an OSL has held that

---

27  [5] The Suggested Licenses are the Eclipse Public License 2, the GNU Affero General Public License version 3, the GNU General Public License version 2, the GNU General Public License version 3, the GNU Lesser General Public License version 2.1, and the Mozilla Public License 2.0. *See* ECF No. 1-1, Appendix A.

1  such claims are the subject of contract law. *Artifex Software*, 2017 WL 1477373, at *3; *Versata*

2  *Software,* 2014 WL 950065, at *5; *SFC*, 2022 WL 1527518, * 3. In *Versata Software*, for example,

3  the district court considered whether a counterclaim for breach of the GPL's Source Code

4  Provision was preempted by copyright law. The *Versata* court rejected the argument that this

5  provision "amount[ed] to nothing more than a promise to not commit copyright infringement"—

6  in other words, a right that was not recognized as one of the exclusive rights protected by

7  copyright. *Versata Software*, 2014 WL 950065, at *5. As the court explained, the plaintiff breached

8  an additional obligation: "an affirmative promise to make its derivative work open source because

9  it incorporated an open source program into its software," which was "an additional contractual

10  promise separate and distinct from any rights provided by the copyright laws." *Id.*

11      Similarly, in *Artifex Software*, the district court held that the Copyright Act did not

12  preempt a contract claim alleging a breach of the GPL's requirement to share source code,

13  recognizing the GPU GPL's open-source requirement to be an "extra element" or additional

14  contractual promise. *Artifex Software*, 2017 WL 1477373, at *3. And more recently in *SFC*, 2022

15  WL 1527518, the district court squarely recognized that there was "no right to receive certain

16  works—or source code in particular—under the Copyright Act" and that such a right would in

17  fact appear to be "*the very opposite*" of those exclusive rights recognized under the Act. *Id.* at *3.

18  Thus, the court upheld a breach of contract claim in relation to the very same breach allegations

19  Plaintiffs make here.

20      So, too, should the Court here. Plaintiffs have plausibly alleged that Copilot outputs

21  source code licensed under OSLs that include copyleft provisions, and that the failure of Copilot

22  to provide the source code or the corresponding license directly contravenes this scheme. SAC

23  ¶¶ 13-20. Neither of these rights are protected by the Copyright Act. Therefore, even if the Court

24  determined that the attribution and notice requirements in this case are conditions rather than

25  covenants that limit the scope of the OSLs, Plaintiffs have still plausibly alleged breaches of

26  copyleft provisions, which courts have routinely found to be covenants under contract law.

27  **IV.    CONCLUSION**

28      For the foregoing reasons, OpenAI's motion to dismiss the SAC should be denied.

1  Dated: March 27, 2024

By: _____/s/ Joseph R. Saveri_____

2                                          Joseph R. Saveri

3  Joseph R. Saveri (State Bar No. 130064)
   Cadio Zirpoli (State Bar No. 179108)

4  Christopher K.L. Young (State Bar No. 318371)
   Louis A. Kessler (State Bar No. 243703)

5  Elissa A. Buchanan (State Bar No. 249996)
   William W. Castillo Guardado (State Bar No. 294159)

6  Holden J. Benon (State Bar No. 325847)

7  **JOSEPH SAVERI LAW FIRM, LLP**
   601 California Street, Suite 1000

8  San Francisco, CA 94108

9  Telephone:     (415) 500-6800
   Facsimile:     (415) 395-9940

10 Email:         jsaveri@saverilawfirm.com

11                czirpoli@saverilawfirm.com
                  cyoung@saverilawfirm.com

12                lkessler@saverilawfirm.com
                  eabuchanan@saverilawfirm.com

13                wcastillo@saverilawfirm.com

14                hbenon@saverilawfirm.com

15 Matthew Butterick (State Bar No. 250953)
   1920 Hillhurst Avenue, #406

16 Los Angeles, CA 90027

17 Telephone:     (323) 968-2632
   Facsimile:     (415) 395-9940

18 Email:         mb@butericklaw.com

19 *Counsel for Individual and Representative*
   *Plaintiffs and the Proposed Class*

20

21

22

23

24

25

26

27

28